**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MATHEW MUSLADIN,
                    *Petitioner-Appellant,*

v.

ANTHONY LAMARQUE,
                    *Respondent-Appellee.*

No. 03-16653

D.C. No.
CV-00-01998-JL

OPINION

Appeal from the United States District Court
for the Northern District of California
James Larson, Magistrate Judge, Presiding

Argued and Submitted
January 24, 2008—Pasadena, California

Filed February 12, 2009

Before: Stephen Reinhardt, David R. Thompson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

1685

## COUNSEL

Sanford Svetcov, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, California, for the petitioner-appellant.

Gregory A. Ott and Peggy S. Ruffra, Deputy Attorneys General, Gerald A. Engler and Dane R. Gillette, San Francisco, California, Assistant Attorneys General, and Edmund G. Brown Jr., Attorney General of the State of California, for the respondent-appellee.

## OPINION

BERZON, Circuit Judge:

Mathew Guy Musladin appeals the district court's denial of his petition for a writ of habeas corpus. In a prior decision, we reversed the district court on the ground that buttons depicting the victim worn by spectators at Musladin's trial impermissibly conveyed to jurors the message that Musladin was guilty, and we declined to address Musladin's other claims. *Musladin v. Lamarque*, 427 F.3d 653 (9th Cir. 2005). Our decision was reversed by the Supreme Court. *Carey v. Musladin*, 549 U.S. 70 (2006). We consider the remaining issues in this appeal.

## BACKGROUND

Our previous decision explained the factual background of Musladin's case:

> Musladin was charged in a California state court with first degree murder for the killing of Tom Studer, the fiance of his estranged wife Pamela. On May 13, 1994, Musladin came to the house where Pamela, Studer, and Pamela's brother Michael Albaugh lived in order to pick up his son for a scheduled weekend visit. Pamela testified that she and Musladin had an argument, and that Musladin pushed her to the ground. According to Pamela, when Studer and Albaugh came out of the house to assist her, Musladin reached into his car to grab a gun and fired two shots at Studer, killing him. Musladin contends, however, that after Pamela fell to the ground, Studer and Albaugh appeared, holding a gun and a machete respectively, and threatened him. Musladin asserted that, after seeing the weapons, he shot in the general direction of Studer out of fear for his own life. Accordingly, at trial Musladin argued perfect and imperfect self-defense. There is no dis-

pute that Musladin fired the shot that killed Studer, although experts for both sides agree that the fatal shot was the result of a ricochet rather than a direct hit.

427 F.3d at 654-55.

The California courts rejected Musladin's direct appeal and petition for post-conviction relief.

Musladin challenges the trial court's failure to consult with defense counsel before responding to a jury note; his attorney's failure to request a limiting instruction and to investigate a threatening statement by Studer; and the trial court's exclusion of certain evidence. We recite the relevant facts with our discussion of each specific claim below.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Musladin can prevail on a claim "that was adjudicated on the merits in State court" only if he can show that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision will be "contrary to" federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case yet reaches a different result. *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000). It will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." *Id.* at 409.

On habeas review, we assess the prejudicial impact of most constitutional errors by asking whether they "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007) (*Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness). As we discuss further below, however, some constitutional errors do not require that the petitioner demonstrate prejudice. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *United States v. Cronic*, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard. *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (2002).

We review the last reasoned state court opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Where the state court decided an issue on the merits but provided no reasoned decision, we conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decision." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

We review the district court's denial of Musladin's petition for a writ of habeas corpus *de novo*. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

## ANALYSIS

### I.

Musladin argues that the trial court's failure to consult with defense counsel before responding to a mid-deliberations jury note deprived him of his Sixth Amendment right to counsel.

### A.

On the second day of jury deliberations, the jury sent the following note to the trial court:[1]

> We need amplification of the following:
>
> 1) The definition of Murder of the first degree contains the phrase "express malice" — ~~Whereas the def'n of murder of the second degree, "express" malice is omitted.~~
>
> (a) Does this exclude "implied" malice?

The trial court notified counsel, and Musladin's attorney said that he would "drop everything and be right over," which he did, arriving ten to fifteen minutes after he was summoned. Before defense counsel arrived, however, the trial court returned the note to the jury with the written direction: "REFER TO THE INSTRUCTIONS."[2] Less than an hour later, the jury returned its verdict of guilty on all charges.

Because the state courts denied this claim on the merits but without a reasoned decision,[3] "we independently review the

---

[1] The crossed-out portion appears as it did in the jury's note.

[2] Musladin agrees that the original jury instructions correctly state that under California law, express malice is required for a verdict of first-degree murder.

[3] On Musladin's direct appeal, the California court of appeal ruled that he had waived this claim. On his state habeas appeal, however, the Cali-

record, [but] still defer to the state court's ultimate decision." *Pirtle*, 313 F.3d at 1167.

## B.

## 1.

**[1]** In *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court reiterated the importance of counsel for criminal defendants: "Lawyers in criminal cases 'are necessities, not luxuries.' Their presence is essential because they are the means through which the other rights of the person on trial are secured." *Id.* at 653 (footnote omitted) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)). The right to effective assistance of counsel, in other words, "is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Id.* at 658. Consequently, "[a]bsent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *Id.* Nonetheless, there are some circumstances "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* (footnote omitted). *Cronic* held that courts are "require[d] . . . to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Id.* at 659 (footnote omitted).[4] There is no question here that Musladin was

---

fornia Supreme Court ordered the state to respond to the claim and then denied the petition without opinion, effectively ruling on the merits. *See In re Robbins*, 18 Cal. 4th 770, 814 (1998). The district court held that the federal habeas claim was not procedurally barred, and the state does not challenge this finding on appeal.

[4]For this proposition, *Cronic* cited, *inter alia*, cases involving the complete deprivation of counsel during a mid-trial overnight recess, *Geders v. United States*, 425 U.S. 80 (1976), during closing argument, *Herring v. New York*, 422 U.S. 853 (1975), and at preliminary hearings, *Hamilton v. Alabama*, 368 U.S. 52 (1961); *White v. Maryland*, 373 U.S. 59 (1963) (per curiam). 466 U.S. at 659 n.25.

denied counsel during the formulation and delivery of the response to the jury note. The parties disagree about whether this was a "critical stage of his trial" and, if so, whether the deprivation of counsel during this time warrants automatic reversal.

## 2.

**[2]** *Cronic* states that the complete deprivation of counsel at a critical stage requires reversal, without inquiry into prejudice: "There are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. . . . The presumption that counsel's assistance is essential *requires* us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Cronic*, 466 U.S. at 658-59 (emphasis added). Relying on *Cronic*, the Sixth Circuit has recently held that the deprivation of counsel during jury reinstruction is automatically reversible error. *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003) ("[U]nder *Cronic*, . . . if Petitioner's trial counsel was, indeed, absent during the re-instruction, a structural error occurred in the trial court proceeding . . . . Any conclusion otherwise would be an unreasonable application of clearly established federal law as stated in *Cronic*.").

The state argues, however, that the Supreme Court has backed away from the bright-line *Cronic* position regarding automatic prejudice. It points out that, in *Satterwhite v. Texas*, 486 U.S. 249 (1988), the Court considered a habeas petitioner's argument that depriving a capital defendant of the opportunity to consult with counsel before participating in a psychiatric examination designed to determine his future dangerousness — a Sixth Amendment violation established in *Estelle v. Smith*, 451 U.S. 454 (1981) — required automatic reversal:

> Satterwhite urges us to adopt an automatic rule of
> reversal for violations of the Sixth Amendment right

> recognized in *Estelle v. Smith*. He relies heavily upon the statement in *Holloway* [*v. Arkansas*, 435 U.S. 475 (1978),] that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic. *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Hamilton v. Alabama*, 368 U.S. 52 (1961); *White v. Maryland*, 373 U.S. 59 (1963)." 435 U.S. at 489. His reliance is misplaced, however, for *Holloway*, *Gideon*, *Hamilton*, and *White* were all cases in which the deprivation of the right to counsel affected — and contaminated — the entire criminal proceeding.

*Satterwhite*, 486 U.S. at 257. *Satterwhite* did not mention *Cronic*, but parenthetically described *White* and *Hamilton* — cases cited in *Cronic* as examples of deprivation of counsel at a critical stage — as involving the "absence of counsel from arraignment proceeding that affected entire trial because defenses not asserted were irretrievably lost." *Id.* at 256; *see also Penson v. Ohio*, 488 U.S. 75, 88-89 (1988) (finding complete deprivation of counsel on appeal to be structural error, relying on both *Cronic* and *Satterwhite*). Thus, the state argues, *Satterwhite*'s focus was on the effect of the absence of counsel on the proceeding as a whole.

A few years later, in *Arizona v. Fulminante*, the Supreme Court conducted an overall survey, not limited to deprivation of counsel situations, of the kinds of cases in which prejudice is presumed. The common thread, it found, was that the error was a "structural defect affecting the framework within which the trial proceeds," resulting in " 'a criminal trial [that] cannot reliably serve its function as a vehicle for determination of guilt or innocence.' " 499 U.S. at 310 (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). According to the state, *Satterwhite* and *Fulminante* indicate that a new test, focusing on the pervasiveness of the error, has been substituted for *Cronic*'s

bright-line rule that deprivation of counsel at a critical stage is automatically reversible error.[5]

[3] We cannot agree. *Cronic* specifically holds that automatic reversal is required where a defendant is denied counsel at a "critical stage," and we cannot depart from that holding. The state's argument that we need no longer follow *Cronic* because of *Satterwhite* and *Fulminante* is simply wrong. The Supreme Court has made clear that the circuit courts must follow Supreme Court precedent until the Supreme Court itself declares it no longer binding. This is true even if the Court's subsequent decisions cast strong doubt on the continuing strength of the precedent. " 'If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.' " *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). *Agostini* is applicable here: Because *Cronic* is directly on point, we are required to continue to apply *Cronic*'s rule of automatic reversal in cases involving absence of counsel at a critical stage.

Moreover, the Supreme Court has repeatedly cited *Cronic*'s holding approvingly. Less than a year ago the Supreme Court described *Cronic* without indicating any adjustment to its essential holding:

---

[5]The First Circuit appears to have so concluded, holding that, despite *Cronic*, a trial court's supplemental instruction without consulting counsel did not warrant automatic reversal: "The Supreme Court recently has emphasized how seldom circumstances arise that justify a court in presuming prejudice (and, concomitantly, in forgoing particularized inquiry into whether a denial of counsel undermined the reliability of a judgment). . . . The only Sixth Amendment violations that fit within this narrowly circumscribed class are those that are pervasive in nature, permeating the entire proceeding." *Ellis v. United States*, 313 F.3d 636, 643 (1st Cir. 2002) (finding counsel's absence during jury reinstruction was "momentary lapse" not warranting a presumption of prejudice).

*Cronic* held that a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial," *Bell v. Cone*, 535 U.S. 685, 695 (2002), when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *Cronic, supra*, at 658. *Cronic*, not *Strickland*, applies "when . . . the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial," 466 U.S., at 659-660, and one circumstance warranting the presumption is the "complete denial of counsel," that is, when "counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding," *id.*, at 659, and n.25.

*Wright v. Van Patten*, 128 S.Ct. 743, 746 (2008) (per curiam) (footnote omitted, alterations in original). Similar affirmations of *Cronic*'s "critical stage" rule are found in numerous other Supreme Court cases issued after *Fulminante* and *Satterwhite*. *See Bell*, 535 U.S. at 695 ("In *Cronic* . . . . we identified three situations implicating the right to counsel that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' First, and '[m]ost obvious' was the 'complete denial of counsel.' A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at 'a critical stage' . . . ." (quoting *Cronic*, 466 U.S. at 658-59)); *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) ("We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary."); *Roe v. Flores-Ortega*, 528 U.S. 470, 483

(2000) ("In *Cronic*, *Penson*, and *Robbins*, we held that the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice . . . .").

**[4]** Because *Cronic* is directly on point and has not been overruled by the Supreme Court, its rule requiring automatic reversal where a defendant was denied counsel at a "critical stage" is binding on this court. Moreover, it remains " clearly established Federal law, as determined by the Supreme Court of the United States," and thus applies in proceedings governed by AEDPA.[6] 28 U.S.C. § 2254(d)(1).

**3.**

We next consider whether the mid-deliberations communication with the jury here constituted a critical stage of Musladin's trial. The Supreme Court has not provided a definitive list of *Cronic* "critical stages." However, AEDPA's "clearly established Federal law" requirement does not demand more than a "principle" or "general standard" in the Supreme Court's caselaw before habeas relief can be granted:

---

[6]We note that, because the state court provided no reasoning for its denial of this claim, we do not know if it concluded that the mid-deliberations communication with the jury was not a critical stage, or if it found a "critical stage" but conducted harmless error review. If the latter, we would have found the state court's conclusion "contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), and our inquiry into the critical stage question would be *de novo*, without AEDPA's deferential constraints. *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (en banc); *see also Panetti*, 127 S.Ct. at 2858-59. But we are bound to "presum[e] that state courts know and follow the law," and we have been instructed that AEDPA's deferential standard "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). We thus must assume the state court found that the stage at issue here was not a "critical stage" such that *Cronic* requires automatic reversal. Our inquiry is limited by AEDPA to determining whether that conclusion was contrary to, or an unreasonable application of, *Cronic*.

AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

*Panetti v. Quarterman*, 127 S.Ct. 2842, 2858 (2007) (citations and quotation marks omitted); *see also Williams*, 529 U.S. at 382 (opinion of Stevens, J.) ("[R]ules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule."). As the Sixth Circuit stated, "[T]he *Cronic* court has only carved out a broad rule, a rule that must be applied in the many factually distinct situations that will come before the lower courts." *Caver*, 349 F.3d at 350 n.7 (holding the absence of defense counsel during jury reinstruction to be a deprivation of counsel during a critical stage under clearly established federal law). Because *Cronic* provides a general standard applicable to claims regarding the denial of counsel at a "critical stage" of the proceedings, the question before us is simply whether the state court's application of that standard in Musladin's case was objectively unreasonable.

*Cronic* itself did not provide a general definition as to what constitutes a "critical stage." However, the Supreme Court later clarified that the phrase was used "to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused." *Bell*, 535 U.S. at 695-96 (footnote omitted). The cases cited in *Cronic* for the "critical stage" rule support this basic standard. For example, in *Geders v. United States*, 425 U.S. 80 (1976), the defendant was not permitted to consult with his attorney during an overnight recess in the middle of trial. The Supreme Court reversed without conducting a prejudice inquiry, noting that

overnight recesses "are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier." *Id.* at 88. Given the import of the overnight trial recess in the development of defense strategy, it is a time that plainly has "significant consequences for the accused." Similarly, in *Herring v. New York*, 422 U.S. 853 (1975), defense counsel was not permitted to make a closing argument. The Court, reversing without discussing prejudice, described the role of closing argument:

> [C]losing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt. . . . In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Id.* at 862.

**[5]** To determine whether *Cronic* applies to Musladin's claim, we must therefore determine whether the deprivation of counsel here occurred during a stage holding "significant consequences" for criminal defendants. Even if we answer that question affirmatively, AEDPA requires that we then determine whether a state court decision answering that ques-

tion in the negative would be an objectively unreasonable application of *Cronic*'s general standard.

We first consider the significance of communications between the jury and the trial court during jury deliberations. Jury deliberations are the apex of the criminal trial. All the evidence and arguments presented to the jury are processed and weighed at that time. Jurors are particularly susceptible to influence at this point, and any statements from the trial judge — no matter how innocuous — are likely to have some impact:

> In a trial by jury . . . , the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. The influence of the trial judge on the jury is necessarily and properly of great weight, and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word.

*Bollenbach v. United States*, 326 U.S. 607, 612 (1946) (internal citations and quotation marks omitted).

[6] The delicate nature of communication with a deliberating jury means that defense counsel has an important role to play in helping to shape that communication. The Supreme Court so recognized over eighty years ago, in *Shields v. United States*, 273 U.S. 583 (1927). *Shields* found error in the trial court's response to a mid-deliberations jury note without notifying the defendant or his counsel:

> "Where a jury has retired to consider of its verdict, and supplementary instructions are required, either because asked for by the jury or for other reasons, they ought to be given either in the presence of counsel or after notice and an opportunity to be present; and written instructions ought not to be sent to the

jury without notice to counsel and an opportunity to object."

*Id.* at 588-89 (quoting *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76 (1919)).[7] Similar emphasis appears in our case law:

We have repeatedly recognized how seriously jurors consider judges' responses to their questions. . . . [W]e know that analytically correct answers to a jury may unnecessarily — and improperly — influence a jury. Furthermore, even if not improper, we recognize that some influence on the jury's deliberations is difficult to avoid when the jury is troubled enough to seek advice. . . .

Because of the delicate nature of such mid-deliberation inquiries, . . . [the p]resence [of the defendant or his counsel] is critical when a jury's questions are discussed because counsel might object to the instruction or may suggest an alternative manner of stating the message — a critical opportunity given the great weight that jurors give a judge's words. The defendant's or attorney's presence may also be an important opportunity to try and persuade the judge *to* respond.

*Frantz*, 533 F.3d at 742-43 (citations, quotation marks, alteration, and footnote omitted).

Nor is defense participation significant only when delivering supplemental instructions. We have recognized its importance when responding to a jury's deadlock:

---

[7]*Shields* has been characterized as resting on "non-constitutionally based rules of orderly trial procedure," *Rushen v. Spain*, 464 U.S. 114, 119 n.4 (1983), but nonetheless is relevant for our purposes because it emphasizes the significance of communications with a deliberating jury.

> A defendant's participation in formulating a response to a deadlocked jury, whether through his counsel or by his personal presence as well, may be important to ensuring the fairness of the verdict. . . . [M]inority members of a deadlocked jury are especially susceptible to pressure from the majority to change their views. A defendant should be afforded the opportunity to request that the jury be reinstructed on the burden of proof or on its members' duty to decide according to their own consciences.

*United States v. Frazin*, 780 F.2d 1461, 1469 (9th Cir. 1986). We have also noted the significance of counsel when a jury requests the readback of trial testimony:

> If present and participating, [the defendants] or their lawyers could have made certain, where appropriate, that testimony of defense witnesses was read as well as that of the state's witnesses. They could also have ensured that any cross-examination of prosecution witnesses would be read in addition to direct testimony. They could also have made certain that the court reporter's notes were accurate, that her notes accurately reflected the witnesses' testimony, and that she did not unduly emphasize any part of the requested testimony or use any improper voice inflections.

*Fisher v. Roe*, 263 F.3d 906, 915 (9th Cir. 2001), *overruled on other grounds by Payton v. Woodford*, 346 F.3d 1204 (9th Cir. 2003) (en banc), *rev'd sub nom*, *Brown v. Payton*, 544 U.S. 133 (2005).

[7] These cases suggest that *any* communication to the jury during deliberations carries significant consequences.[8] None-

---

[8]Two circuits have held that the delivery of supplemental jury instructions is a *Cronic* critical stage, and thus found the denial of counsel during

theless, several circuits have distinguished cases involving the delivery of new, supplemental jury instructions from cases, such as Musladin's, in which the jury is given previously agreed-upon instructions or read back trial testimony.[9] To the extent that those cases can be read as resting the *Cronic* assessment on the response rather than the question — that is, on whether the jury was given a supplemental instruction or simply referred to previous instructions or testimony — we disagree.[10] The "stage" at which the deprivation of counsel may

---

such delivery a Sixth Amendment violation. *French v. Jones*, 332 F.3d 430, 438 (6th Cir. 2003); *Curtis v. Duval*, 124 F.3d 1, 4 (1st Cir. 1997) (finding that "recalling the jury for supplemental instructions after deliberations are underway is a critical stage of a criminal trial" under *Cronic*). The Seventh Circuit, however, has held to the contrary. *United States v. Widgery*, 778 F.2d 325, 329 (7th Cir. 1985) ("A judge's failure to show jurors' notes to counsel and allow them to comment before responding violates Fed. R. Crim. P. 43(a), not the constitution.").

[9] In *Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003), for example, the Sixth Circuit held that "reading instructions to the jury is not a critical stage of the proceedings if trial counsel has previously agreed to the instructions." *Id.* at 217 (distinguishing *French* "because the supplemental instructions given in *French* had not been articulated by the trial court before the jury began deliberating"); *see also United States v. Hillsman*, 480 F.3d 333, 335-36 (5th Cir. 2007) (citing *Hudson* for the proposition that "the 'rereading of identical jury instructions is not a critical stage of a criminal trial' "); *United States v. Toliver*, 330 F.3d 607, 614 (3d Cir. 2003) ("Clarifying the substantive elements of the charged offense . . . or instructing a deadlocked jury . . . affirmatively guides jurors as to how they should fulfill their decisionmaking function. But submitting verbatim specifically excerpted record testimony that the jury itself had requested does not similarly 'instruct' the jury.").

[10] To some extent, the cases cited can be read as holding simply that a jury's request that instructions already given be read again is not a critical stage. To the degree that this is their import, they are not directly relevant, as that is not what happened in this case. *See Hudson*, 351 F.3d at 214 (finding the re-reading of previously-given instructions in response to jury's note, "We need the definition of aiding and abetting and the difference between second and first degree murder," is not a *Cronic* critical stage). Here, the jury asked for "amplification," not for a repetition of the

be critical should be understood as the *formulation* of the response to a jury's request for additional instructions, rather than its delivery. Counsel is most acutely needed before a decision about how to respond to the jury is made, because it is the substance of the response — or the decision whether to respond substantively or not — that is crucial. *See Frantz*, 533 F.3d at 743 ("The defendant's or attorney's presence may also be an important opportunity 'to try and persuade the judge *to* respond.' " (quoting *United States v. Barragan-Devis*, 133 F.3d 1287, 1289 (9th Cir. 1998))).

**[8]** Musladin's case is a perfect example: Although the trial court merely referred the jury to the previously agreed-upon instructions, Musladin's trial counsel averred that, had he been present when the response was formulated, he would have urged the trial court to respond substantively. Thus, it is the missed opportunity to influence the trial court's response to a jury question that is the significant moment.

**[9]** Accordingly, were we reviewing the question before us de novo, we would find that Musladin was denied counsel at a "critical stage," thereby triggering *Cronic*'s rule of automatic reversal. However, AEDPA permits us to grant Musladin's request for relief only if the state court's decision was "contrary to, or an unreasonable application of," the *Cronic* standard. 28 U.S.C. § 2254(d)(1). Specifically, we must find that a state court would be objectively unreasonable in holding that a mid-deliberations communication to the jury that does no more than refer the jury back to the original jury instructions is not a "critical stage" under *Cronic*.

---

instructions already given. The "amplification" request required the trial court to decide whether to provide additional instructions and, if so, what they should be. That the trial judge refused the request for "amplification" cannot retroactively characterize the "stage" at which that response was given.

**[10]** This we cannot do. Although defense counsel plays a crucial role in formulating *any* mid-deliberation communication to the jury by the trial judge, where the judge simply directs the jury to his previous instructions, the potential impact of defense counsel's inability to participate is significantly lessened, because defense counsel played a role in the formulation of those instructions. In such circumstances, the jury receives only such information as was formulated with defense counsel's participation. Although we do not believe that defense counsel's prior participation is sufficient to render a mid-deliberation communication to the jury less "critical" for purposes of the *Cronic* analysis, we cannot say that it would be unreasonable for a state court to so conclude.[11] Accordingly, we are not free to hold that the state court's decision to require a demonstration of prejudice resulting from the denial of counsel here was objectively unreasonable.

## C.

**[11]** Because the state court's decision not to apply *Cronic* to Musladin's case was not objectively unreasonable, we may grant Musladin's petition only if the denial of counsel at issue here was prejudicial. *See Barragan-Devis*, 133 F.3d at 1289; *Toliver*, 330 F.3d at 615; *see also Satterwhite*, 486 U.S. at 258 (reviewing denial of counsel before psychiatric examination in violation of Sixth Amendment for harmless error); *Rogers v. United States*, 422 U.S. 35, 36-37, 40-41 (1975). Specifically, we must determine whether the denial of counsel " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776). Musladin concedes that the instructions correctly stated the law, but argues that the error was not harm-

---

[11]We note that other circuits have accepted this point of distinction. *See supra* note 9. The mere existence of authority from other circuits does not render a state court's decision objectively reasonable for purposes of AEDPA. It is simply a factor that we may take into consideration. Like state courts, federal circuit courts may sometimes apply clearly established Supreme Court precedent in an objectively unreasonable manner.

less, because the jury was confused about whether he could be convicted of first degree murder based on a finding of implied malice, and the trial court's response — referring the jury to the original, apparently confusing, instructions — was insufficient to clarify the matter.

The relevant instructions were as follows:

"Malice" may be either express or implied. Malice is express when there is manifested an intent unlawfully to kill a human being.

Malice is implied when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

\* \* \*

All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.

The word "willful" as used in this instruction means intentional. The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.

If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding

the idea of deliberation, it is murder of the first degree.

*   *   *

To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill.

Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation.

These instructions clearly required deliberation and premeditation for a finding of first degree murder. "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder in the first degree." The reference to "a clear, deliberate intent on the part of the defendant to kill" accords with the earlier definition of "express malice" as "an intent unlawfully to kill a human being." In addition, the jury was instructed that " 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action" and " 'premeditated' means considered beforehand." The point was further emphasized: "To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

As the California Supreme Court has concluded, a jury "could not find premeditation and deliberation without determining that defendant had a state of mind constituting express malice." *People v. Catlin*, 26 Cal.4th 81, 151 (2001). Where, as here, "the premeditation instruction included a requirement that the jury find a 'killing . . . preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill[,]' . . . [t]he jury would understand the requirements of express malice under the instructions as a whole." *Id.* (first alteration in original, quoting CALJIC No. 8.20).

**[12]** In sum, even if the jury believed "implied malice" was sufficient for first degree murder, the instructions clearly required it to find deliberation and premeditation before reaching its verdict of first degree murder. In finding deliberation and premeditation, the jury effectively found express malice. Thus, we cannot conclude that the deprivation of counsel here " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776).

## II.

Musladin next argues that his trial counsel was ineffective in (1) failing to request a limiting instruction on hearsay statements made by his son, Garrick, and (2) failing to investigate the victim's threat to Musladin. As with the *Cronic* claim, the state courts denied both these claims on the merits but without a reasoned decision. So we "independently review the record, [but] still defer to the state court's ultimate decision." *Pirtle*, 313 F.3d at 1167.

To establish ineffective assistance of counsel, a defendant first "must show that counsel's performance was deficient," in other words, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He then must show he was prejudiced

by the deficient performance, "that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.*

## A.

## 1.

Pamela's brother, Michael Albaugh, testified that, when he saw Musladin reach under the seat of his car, he yelled, "He's got a gun." On cross-examination, defense counsel asked Albaugh why he believed Musladin was reaching for a gun. Albaugh testified that Musladin's son, Garrick, then three years old, had previously told Albaugh that Musladin had a gun. On redirect, the prosecutor probed further into Garrick's statement. When defense counsel objected, the trial court overruled the objection on the ground that defense counsel had opened the door.[12] Albaugh then testified that, about a month before the shooting, Garrick told him Musladin had a gun and said he "was going to shoot Tom [Studer] with it."

In his closing argument, the prosecutor relied on Albaugh's testimony as uncontroverted evidence of Musladin's intent to murder Studer:

> [S]omething that was uncontroverted in this case, a statement by Garrick . . . [that] "My daddy's got a big black gun. He's going to shoot Tom with it."
>
> You know what? The defense never approached that subject with his client. The closest they got to it, he showed Garrick the gun. Never attacked that state-

---

[12]Although the trial court did not explain the basis for its ruling, the California Court of Appeal on direct appeal concluded that the statement was admitted to "explain[ ] [Albaugh]'s state of mind at the time. [Albaugh] was aware that defendant had a gun prior to seeing it, because Garrick had told him both that his father had a gun and that he intended to use the weapon against Tom."

ment. It's true. There is no evidence controverting this statement by Garrick to Mike Albaugh . . . .

* * *

He shows the gun to Garrick and he talks about his intent when he holds that gun, what he wants to do with this. As he showed it to a four-year-old.[13] That's what he did. There's been no denial by the defendant as to making that statement. The only evidence before you is that it's true.

Musladin argues that defense counsel's failure to ask for a limiting instruction directing the jury that it could not consider the statement for its truth constituted ineffective assistance of counsel.[14]

### 2.

To prevail on his ineffective assistance of counsel claim, Musladin must first show that trial counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687.

The state argues that the decision not to request a limiting instruction was a reasonable trial strategy because trial counsel did not want to draw the jury's attention to Garrick's damaging statement. In general, the decision not to request a limiting instruction is "solidly within the acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning evidence." *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996). Here, the testimony occupied only a very minor portion of the eleven-day trial. Were the issue confined

---

[13]In fact, the evidence showed that Garrick was three at the time.

[14]We note that Musladin makes no distinction between Garrick's statement to Albaugh that Musladin had a gun and Garrick's statement that Musladin said he was going to shoot Studer with the gun.

to the failure to request a limiting instruction during the taking of evidence, we might find the decision not to request a limiting instruction to constitute adequate representation.

But the reasonable strategic basis for failing to request a limiting instruction vanished when, during closing arguments, the prosecutor pointed to Garrick's statements as uncontroverted evidence of premeditation. The jury's attention was directly drawn to the evidence, so a limiting instruction did not risk highlighting evidence the jury might have forgotten. More significantly, the jury was invited to draw the precise inference — that Garrick's statement was true — that a limiting instruction would have prohibited.

A similar situation was presented in *Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007). Albrecht was charged with murder and arson after allegedly setting his house on fire and causing the deaths of his wife, mother, and daughter. *Id.* at 109. During the trial, the state introduced substantial evidence that, in the seven months preceding the fire, Albrecht had physically abused his wife. *Id.* at 109-10. This evidence was introduced to prove motive and identity, which the state argued "could be inferred from the violence and hostility Albrecht had directed toward Mrs. Albrecht in the months before the fire." *Id.* at 109. Although the evidence was introduced for this limited purpose, Albrecht's attorney did not request a limiting instruction.

In his federal habeas petition, Albrecht argued that this failure constituted ineffective assistance of counsel, because the jury could have impermissibly used the evidence of spousal abuse as propensity evidence. The Third Circuit acknowledged that, in general, "[t]rial counsel is not constitutionally required to request a limiting instruction any time one could be given, because counsel might reasonably conclude that such an instruction might inadvertently call attention to the evidence of prior bad acts." *Id.* at 127. But during closing arguments at Albrecht's trial,

the prosecutor improperly related the evidence of spousal abuse to Albrecht's character when he stated that: "If this man were capable of doing this for such a thing, carry it on to its logical conclusion, what type of man is Al Albrecht." In doing so, the prosecutor did not limit his use of the bad acts evidence to proving motive. Instead, he explicitly called upon the jury, by asking "what type of man is Al Albrecht," to view the evidence of prior bad acts as evidence of Albrecht's bad character and propensity to commit this crime.

*Id.* at 128 (record citation omitted). In such a case, "the need for a limiting instruction was not hypothetical," and the failure to request it was deficient performance. *Id.* at 128.

**[13]** Such is the case here. After the prosecutor drew the jury's attention to the damaging statement and invited them to draw the precise inference that a limiting instruction would have forbidden, Musladin's trial counsel's failure to request a limiting instruction "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687.[15]

### 3.

To prevail on his *Strickland* claim, Musladin must further show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Musladin argues that Garrick's statement was the only evidence of premeditation, and that he was thus prejudiced by his attorney's failure to request a limiting instruction. Cer-

---

[15]Because there was *no* justification for trial counsel's failure to request a limiting instruction, a decision finding trial counsel's performance non-deficient would be "objectively unreasonable" for the purposes of AEDPA.

tainly, Garrick's statement was powerful evidence of premeditation. Nevertheless, even though we might agree with Musladin's argument if we were reviewing this case de novo, we cannot do so here, in light of AEDPA's requirement that we defer to the state court's conclusion denying the claim. *See Brown v. Ornoski*, 503 F.3d 1006, 1016 (9th Cir. 2007). Deference does not, of course, mean blind acceptance, but it means enough to compel us to accept the state court's conclusion where the answer is as unclear as it is here.

The evidence at trial showed that Musladin fired two shots. He fired the first as he stood by his truck. According to Musladin's testimony, he believed Studer and Albaugh were coming toward him with weapons. The evidence with respect to Musladin's premeditation for this shot was disputed. The state submitted evidence that Musladin made threatening statements to and about Studer before shooting; Musladin denied making such statements. Albaugh testified that Musladin did not load his gun before firing, suggesting it was already loaded and that he had contemplated using it; Musladin testified it was unloaded and inside its case because he had not planned to use it. And there was conflicting testimony about whether Studer was running from or facing Musladin when Musladin fired the shot. So, had the first shot been the only one, Garrick's statement that his father had planned to shoot Studer could well have tipped the jury toward believing the prosecution's version of these facts, and the failure to ask for an instruction telling the jury not to rely on the statement for that purpose could have altered the outcome of the trial.

But — according to Musladin's own testimony — after he saw his first shot hit its target, he took four or five steps toward the garage, where Studer was, and then fired another shot.[16] The evidence strongly suggested that this shot was

---

[16]Musladin testified on cross-examination as follows:

    Q.  Sir, you testified on direct examination that you walked up the driveway [toward the garage]?

fired from close range.[17] Although Musladin testified that he saw "a gun barrel c[o]me out and . . . heard a loud noise" before firing his second shot, no gun was found near Studer's body, nor was there any object that might have been mistaken for a gun. Moreover, it is significant that Musladin chose to head *toward* the garage, where Studer was located, rather than away from it.

Thus, even if the first shot was fired in the belief that Musladin was defending himself from attack, it would not be unreasonable for a jury to reject Musladin's contention that he followed Studer into the garage to fire again for that reason.[18]

---

A.  About four or five steps.

Q.  So here's a situation where someone's still armed in your belief?

A.  Yes.

Q.  And you walk up to finish off the job, right?

A.  No.

Q.  Why do you walk up the driveway then?

A.  To get away from Garrick. I didn't want any gunshots coming towards him.

Q.  Sir, you could walk in a lot of different directions besides walking up.

A.  You're in shock. You're trying to defend yourself. You're just doing what you can to survive.

[17]Although the evidence indicated that the second shot hit Studer after first ricocheting off something else, all the evidence, including Musladin's own testimony, indicated that Musladin purposefully aimed at Studer but simply missed.

[18]Musladin argued both perfect and imperfect self-defense at trial. As the jury was charged:

The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes that there is an imminent danger that the other

As the jury was instructed, even a brief moment of premeditation is sufficient:

> The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.
>
> The time will vary with different individuals and under varying circumstances.
>
> The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time . . . .

And, not surprisingly, in closing, the prosecutor argued that premeditation could be found from the fact of the second shot alone:

> [H]ow reasonable is it if you believe someone is still armed with a rifle that you are going to walk right in their line of fire.

---

person would either kill him or cause him great bodily injury and that it was necessary under the circumstances for him to use in self-defense, such force or means as might cause the death of the other person, for the purpose of avoiding death or great bodily injury to himself.

\*   \*   \*

A person, who kills another in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.

* * *

All these people that were out there are running
away. There is nothing preventing him from running
north or south this way. He doesn't try to hide. He
pursues Tom because he knows Tom's been shot and
gone down. He knows he has disabled him. And he
follows him.

* * *

The real question, is there premeditation and deliber-
ation in this case? From all the factors, it is. He car-
ries the gun there. He uses the gun. And then he uses
it a second time to shoot someone almost point blank
in the head. That's [sic] second shot makes it, if you
didn't find on the first shot, definitely makes it first
degree.

In California, however, "a verdict of murder in the first
degree on a theory of a wilful, deliberate, and premeditated
killing is proper only if the slayer killed as a result of careful
thought and weighing of considerations; as a deliberate judg-
ment or plan; carried on cooly and steadily, especially accord-
ing to a preconceived design." *People v. Anderson*, 70 Cal. 2d
15, 26 (1968) (citations omitted).

The true test is not the duration of time, but rather
the extent of the reflection. A cold, calculated judg-
ment and decision may be arrived at in a short period
of time, but *a mere unconsidered and rash impulse,
even though it included an intent to kill, is not such
deliberation and premeditation as will fix an unlaw-
ful killing as murder of the first degree.*

To constitute a deliberate and premeditated killing,
the slayer must weigh and consider the question of
killing and the reasons for and against such a choice

and, having in mind the consequences, he decides to and does kill.

*People v. Perez*, 2 Cal. 4th 1117, 1124 (1992) (citations omitted) (emphasis added). On the record in this case, a jury might have concluded that the evidence relating to the second shot suggested only "a mere unconsidered and rash impulse . . . not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree," and that this evidence was insufficient to demonstrate that Musladin "weigh[ed] and consider[ed] the question of killing and the reasons for and against such a choice . . . ." *Id.*

**[14]** While thus not conclusive, the second shot nonetheless constituted strong and independent evidence of premeditation. On the basis of that evidence, it would not have been unreasonable for the state court to have concluded that there is no "reasonable probability that . . . the result of the proceeding would have been different" had Musladin's attorney requested a limiting instruction as to Garrick's statement. 28 U.S.C. § 2254(d)(1); *Strickland*, 466 U.S. at 694.

## B.

With his habeas petition, Musladin submitted a declaration asserting that, "[i]n pre-trial conversations with [defense counsel], although I was unable to provide him with specific names, I told him I had received threats while I was at work." He also submitted a declaration from his former supervisor stating that the supervisor listened to a phone conversation between Musladin and a man Musladin subsequently identified as his estranged wife's new boyfriend, and heard the man tell Musladin, "you better leave us the fuck alone o[r] I'll kill you."

**[15]** We need not decide whether trial counsel's alleged failure to investigate Musladin's vague statement was deficient performance, because we cannot conclude that the state

court was constrained to find that Musladin was prejudiced by the failure. Although evidence of this threat might have persuaded the jury to some extent that Musladin acted in self-defense when firing the *first* shot, it is, for the reasons already discussed, less likely that the jury would have found that Musladin actually believed his life was in danger when he took steps *toward* the garage and fired the *second* shot at a man he knew he had previously hit. The state court could reasonably have found that even if trial counsel had investigated this alleged threat, "the result of the proceeding would [not] have been different." *Strickland*, 466 U.S. at 694.

## III.

Finally, Musladin argues that the trial court's exclusion of evidence that Musladin had claimed self-defense immediately after his arrest deprived him of his due process rights to a fair trial and to present a defense.

The prosecutor sought to undermine Musladin's self-defense theory by suggesting that he had manufactured it for the trial, arguing in closing: "[Musladin] never says to [the arresting officer], they came at me with a machete, he came at me with a rifle. Nothing about self-defense. . . . But now after a year and a half, the defendant came up with some story." To rebut this argument, Musladin proffered testimony from his father that he had called his father from the police station on the day of the shooting but after his arrest, and told his father that he had acted in self-defense.

The trial court refused to permit the testimony because it was "a self-serving declaration [and] plainly hearsay." The court of appeal affirmed on direct appeal, finding the evidence did not fall under the prior consistent statement exception to the hearsay rule because the statement was made after Musladin's arrest and thus after the motive for fabrication arose. *See* Cal. Evid. Code §§ 791(b), 1236. Musladin does not challenge the state's ruling as a matter of state evidentiary law,

but argues the exclusion of the evidence violated his due process rights.

**[16]** We need not consider the merits of Musladin's claim regarding the exclusion of evidence because we conclude that any error did not " fatally infect[ ] the trial." *Lisenba v. California*, 314 U.S. 219, 236 (1941). The proffered testimony has some probative value, as it slightly bolsters the credibility of Musladin's self-defense theory. Yet, although the testimony rebuts the state's suggestion that Musladin spent more than a year formulating the theory, it does not refute the state's more basic argument — that Musladin concocted the theory after his arrest. Thus, it adds some support, but only a little, to Musladin's defense. And even this small support is undermined by the questionable reliability of the evidence, as the witness is a close family member. *See Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000) ("Because the reliability of the evidence was suspect, its probative value to Whelchel's alibi was minimal."). In short, the essential evidentiary landscape — that the only evidence of Musladin's self-defense was his own statements — would remain the same had the proffered testimony been allowed, so the trial as a whole was not "fatally infected" by the exclusion of the evidence. Accordingly, we do not believe that the exclusion of the evidence violated Musladin's due process rights.

## CONCLUSION

The district court's denial of Musladin's habeas petition is AFFIRMED.