Opinion by Judge REINHARDT; Dissent by Judge CALLAHAN.
OPINION
REINHARDT, Circuit Judge:
State prisoner Hector Juan Ayala (“Ayala”) appeals the denial of his petition for a writ of habeas corpus. During the selection of the jury that convicted Ayala and sentenced him to death, the prosecution used its peremptory challenges to strike all of the black and Hispanic jurors available for challenge. The trial judge concluded that Ayala had established a prima facie case of racial discrimination under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), but permitted the prosecution to give its justifications for the challenges of these jurors in an in camera hearing from which Ayala and his counsel were excluded. The trial judge then accepted the prosecution’s justifications for its strikes without disclosing them to the defense or permitting it to respond. We hold that this procedure violated the Constitution and, together with the state’s later loss of a large portion of the record, adversely affected Ayala’s substantial rights. We therefore reverse the district court’s denial of Ayala’s petition and remand with instructions to grant the writ.
I.
On April 26, 1985, Jose Luis Rositas, Marcos Antonio Zamora and Ernesto Dominguez Mendez were shot and killed in the garage of an automobile repair shop in San Diego, California. A fourth victim, Pedro Castillo, was shot in the back but managed to escape alive. Castillo identified Ayala, his brother Ronaldo Ayala, and Jose Moreno as the shooters. He claimed that these men had intended to rob the deceased, who ran a heroin distribution business out of the repair shop.
Ayala was subsequently charged with three counts of murder, one count of attempted murder, one count of robbery and three counts of attempted robbery. The information further alleged that the special circumstances of multiple murder and murder in the attempted commission of robberies were applicable in his case. A finding that one of these special circumstances was true was required in order for Ayala to be eligible for the death penalty.
Jury selection began in San Diego in January, 1989. Each of the more than 200 potential jurors who responded to the summons and survived hardship screening was directed to fill out a 77-question, 17-page questionnaire. Over the next three months, the court and the parties interviewed each of the prospective jurors regarding his or her ability to follow the law, utilizing the questionnaires as starting points for their inquiry. Those jurors who had not been dismissed for cause were called back for general voir dire, at which *949 smaller groups of jurors were questioned by both the prosecution and the defense. The parties winnowed the remaining group down to twelve seated jurors and six alternates through the use of peremptory challenges. Each side was allotted twenty peremptory challenges which could be used upon any of the twelve jurors then positioned to serve on the jury. After twelve seated jurors were finally selected, both parties were allotted an additional six peremptory challenges to be used in the selection of alternates. The prosecution employed seven of the 18 peremptory challenges it used in the selection of the seated jurors to dismiss each black or Hispanic prospective juror who was available for challenge, resulting in a jury that was devoid of any members of these ethnic groups. In response, Ayala, who is Hispanic, brought three separate motions pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), claiming that the prosecution was systematically excluding minority jurors on the basis of race.[1]
The defense made its first Batson motion after the prosecution challenged two black jurors. The trial court found that the defense had not yet established a prima facie case of racial discrimination, but nevertheless determined that it would require the prosecution to state its reasons for challenging the jurors in question. At the prosecutor’s insistence, and despite the defense’s objections, the court refused to let the defendant or his counsel be present at the hearing in which the prosecution set forth these reasons and the court determined whether they were legitimate.
The trial judge continued to employ this ex parte, in camera procedure to hear and consider the prosecutor’s purported reasons for challenging minority jurors following the defense’s second and third Batson motions. He did so despite his determination, by the third motion, that the defense had established a prima facie showing of racial discrimination.
Ultimately, the trial judge concluded that the prosecutor had proffered plausible race-neutral reasons for the exclusion of each of the seven minority jurors, and denied the defense’s Batson motions. Although the ex parte Batson proceedings were transcribed, this transcript — and thus, the prosecution’s proffered race-neutral reasons for striking the seven black and Hispanic jurors — were not made available to Ayala and his counsel until after the conclusion of the trial.
The jury convicted Ayala of all counts save a single attempted robbery count, and found true the special circumstance allegations. At the penalty phase, it returned a verdict of death.
Early in the process of jury selection, the trial judge had instructed the parties to return to the court all the questionnaires the prospective jurors had completed, and advised them that he would be “keeping the originals.” At some point during or following the trial, however, all questionnaires, save those of the twelve sitting jurors and five alternates, were lost. The questionnaires of four additional jurors — including the sixth alternate— were located in the defense counsel’s files, but the remaining 193 questionnaires have never been located.
On direct appeal from his conviction, Ayala challenged the trial court’s use of ex parte Batson proceedings, and claimed *950 that the loss of the jury questionnaires deprived him of his right to a meaningful appeal of the denial of his Batson motion. A divided California Supreme Court upheld his conviction and sentence. People v. Ayala, 24 Cal.4th 243, 99 Cal.Rptr.2d 532, 6 P.3d 193 (2000). The majority held that the trial judge had erred in conducting the Batson proceedings ex parte. Id., 99 Cal.Rptr.2d 532, 6 P.3d at 204. It went on to hold, however, that any error was harmless beyond a reasonable doubt. Id. It also concluded that the loss of the questionnaires was harmless beyond a reasonable doubt. Id., 99 Cal.Rptr.2d 532, 6 P.3d at 208. In dissent, Chief Justice George, joined by Justice Kennard, expressed his disagreement with the majority’s “unprecedented conclusion that the erroneous exclusion of the defense from a crucial portion of jury selection proceedings may be deemed harmless.” Id., 99 Cal.Rptr.2d 532, 6 P.3d at 221 (George, C.J., dissenting). Ayala’s petition for certiorari was denied by the United States Supreme Court on May 14, 2001. Ayala v. California, 532 U.S. 1029, 121 S.Ct. 1978, 149 L.Ed.2d 770 (2001).
Ayala timely filed his federal habeas petition. The district court denied relief, but issued a Certificate of Appealability as to Ayala’s Batson-related claims and his claim that the state had violated his Vienna Convention right to consular notification.[2] Ayala now appeals.
II.
Ayala’s petition is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See Kennedy v. Lockyer, 379 F.3d 1041, 1046 (9th Cir.2004). We may grant relief only if the last state court decision on the merits of Ayala’s claim was (1) “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;” or (2) “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d).
III.
“For more than a century, [the Supreme] Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause.” Georgia v. McCollum, 505 U.S. 42, 44, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), established the three-step inquiry used to determine whether this basic' constitutional guarantee has been violated. First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges in a racially discriminatory manner. Id. at 96, 106 S.Ct. 1712. Such a showing can be made, as the trial judge concluded it was in Ayala’s case, where the prosecution has engaged in a pattern of strikes against jurors of a particular race. Id. at 97, 106 S.Ct. 1712. Second, once the defendant has made a prima facie showing, “the burden shifts to the State to eomé forward with a neutral explanation for challenging” the jurors. Id. Third, the trial court must then determine whether, taking into consideration the prosecutor’s explanations for his conduct, “the defendant has established purposeful discrimination.” Id. at 98, 106 S.Ct. 1712.
Ayala contends that the exclusion of the defense from the proceedings in which the prosecution justified its strikes of the seven black or Hispanic jurors, and the trial court accepted those justifications, violated his right to the assistance of counsel and *951 his right to be personally present and to assist in his defense, and prevented him from ensuring that the prosecution did not violate his fundamental right to a jury chosen free from racial discrimination. Here, we need hold only that, in these circumstances, the exclusion of defense counsel during Batson steps two and three violated the Constitution.
A.
The California Supreme Court, when confronted with Ayala’s claim, concluded that the exclusion of defense from these proceedings was, in fact, erroneous. It observed that “it seems to be almost universally recognized that ex parte proceedings following a [Batson ] motion ... should not be conducted unless compelling reasons justify them.” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 203. Although such “compelling reasons” might exist if the prosecution’s justifications for its strikes require it to divulge “strategic information,” the Court determined that “no matters of trial strategy were revealed” during the Batson proceedings in Ayala’s case. Id., 99 Cal.Rptr.2d 532, 6 P.3d at 202-03. Accordingly, the Court concluded, the trial court had erred in excluding Ayala and his counsel from these proceedings — certainly as a matter of state law, and perhaps also as a matter of federal constitutional law. Id., 99 Cal.Rptr.2d 532, 6 P.3d at 204.
Because the California Supreme Court acknowledged that the trial court might have violated Ayala’s federal constitutional rights, we do not apply § 2254(d)’s deferential standard to this aspect of the state court’s decision. See Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 452, 175 L.Ed.2d 398 (2009) (reviewing de novo whether petitioner’s counsel had been constitutionally deficient because state court had decided only that petitioner was not prejudiced by any deficiency); Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).[3] Section 2254(d) is, however, far from the only obstacle a habeas petitioner must overcome in order for a federal court to consider on the merits his claim that he was deprived of his constitutional rights. Here, the state asserts, and the district court agreed, that Ayala’s claim is barred by Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). “[I]n addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold Teague analysis when the issue is properly raised by the state.” Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).
Under Teague, a “new constitutional rule[ ] of criminal procedure” cannot be applied retroactively to cases on collateral review. 489 U.S. at 310, 109 S.Ct. 1060 (plurality opinion). Thus, “[bjefore a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not ‘new,’ ” but had been established at the time his conviction became final. O’Dell v. Netherland, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). “A holding constitutes a ‘new rule’ within the meaning of Teague if it ‘breaks new ground,’ ‘imposes a new obligation on the States or the Federal Government,’ or was not ‘dictated by precedent existing at *952 the time the defendant’s conviction became final.’ ” Graham v. Collins, 506 U.S. 461, 467, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (quoting Teague, 489 U.S. at 301, 109 S.Ct. 1060).[4]
B.
We hold that Ayala’s claim does not require the retroactive application of a new constitutional rule of criminal procedure, and thus is not Teague-barred. At the time Ayala’s conviction became final on May 14, 2001, it was established that defense counsel must be permitted to be present and offer argument during Batson steps two and three when, as in Ayala’s case, the proceedings do not require the prosecution to reveal confidential information or trial strategy.
In this Circuit, this rule was unequivocally “dictated by precedent,” Teague, 489 U.S. at 301, 109 S.Ct. 1060, long before Ayala’s conviction became final, having been established in United States v. Thompson, 827 F.2d 1254 (9th Cir.1987). In Thompson, we held that a district court had constitutionally erred when, after the defendant had established a prima facie case under Batson, the court permitted the prosecution to state the reasons for its peremptory strikes ex parte. Observing that Batson step two might sometimes require the prosecutor to “reveal confidential matters of tactics and strategy,” we recognized that in some circumstances there might be “compelling” reasons to conduct the proceedings ex parte. Id. at 1258-59. We therefore declined to adopt an absolute rule holding that the defense must always be permitted to participate at Batson steps two and three. We held, however, that defense counsel must be permitted to be present and offer argument during Batson steps two and three if the prosecution’s proffered race-neutral reason do not involve confidential or strategic information. Id. at 1258-59.[5]
 Our decision in Thompson represented the straightforward application of two lines of Supreme Court precedent. The first line of precedent finds its source in the Sixth Amendment’s guarantee of the right to counsel. Because “the plain wording of’ the Amendment “encompasses counsel’s assistance whenever necessary to assure a meaningful ‘defence,’ ” the Court has long held that the right applies at all “critical” stages of criminal proceedings. United States v. Wade, 388 U.S. 218, 224-25, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); see also, e.g., White v. Maryland, 373 U.S. 59, 60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Ultimately, the right to counsel “has been accorded ... ‘not for its own sake, but because of the effect it has on *953 the ability of the accused to receive a fair trial.’ ” Mickens v. Taylor, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (quoting United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Foremost among the attributes of a fair trial is the requirement that it be adversarial in nature: “[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.” Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). “The right to the effective assistance of counsel is thus the right of the accused to require the prosecution’s case to survive the crucible of meaningful adversarial testing.” Cronic, 466 U.S. at 656, 104 S.Ct. 2039. As we observed in Thompson, “[t]he right of a criminal defendant to an adversary proceeding is fundamental to our system of justice,” and thus ex parte proceedings are justifiable only as “uneasy compromises with some overriding necessity.” 827 F.2d at 1258.
Batson is the seminal case in the second line of precedent. After setting out the three-stage framework used to determine whether the prosecution has engaged in purposeful racial discrimination in the selection of a jury, the Batson Court declined “to formulate particular procedures to be followed upon a defendant’s timely objection to a prosecutor’s challenges.” 476 U.S. at 99, 106 S.Ct. 1712. Batson made clear, however, that the defendant bears the ultimate burden of persuasion. Id. at 98, 106 S.Ct. 1712. Batson also made clear that a court must consider “all relevant circumstances” in deciding whether a defendant has met his burden of persuasion — an inquiry that requires determining whether a prosecutor’s stated reasons for striking a particular juror are race-neutral, and, if race-neutral, whether they are his actual reasons. Id. at 96-99, 106 S.Ct; 1712; see Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).
In Thompson, we recognized that the Batson framework leaves defense counsel with “two crucial functions” that it must be permitted to perform. 827 F.2d at 1260. The first function is “to point out to the district judge where the government’s stated reason may indicate bad faith.” Id. As we explained:
For example, government counsel here excluded one of the jurors because he lived in defendant’s neighborhood and wore jeans to court. This seems like a legitimate reason, unless a nonexcluded juror also wore jeans or other casual dress, or lived in the same neighborhood as the defendant.... [DJefense counsel might have been able to point out that the stated reasons were pretextual because others similarly situated were allowed to serve. In addition, defense counsel might have been able to argue that the reasons advanced by the prosecution were legally improper.... Of course, the district judge might be able to detect some of these deficiencies by ' himself, but that is not his normal role under our system of justice.
Id. The second function is to “preserve for the record, and possible appeal, crucial facts bearing on the judge’s decision.” Id. at 1261. As we reasoned in Thompson:
All we have before us concerning this issue is the prosecutor’s explanation of her reasons and the district judge’s ruling .... [I]f we are to review the district judge’s decision, we cannot affirm simply because we are confident he must have known what he was doing. We can only serve our function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after learning of the prosecu *954 tor’s reasons.... Here, the record’s silence cannot be reassuring.
Id. Thus, we held, only with the presence and assistance of defense counsel can the trial judge and subsequent appellate judges properly evaluate whether the defense has met its burden of persuasion under Batson. Excluding the defense from the Batson proceedings without some compelling justification therefore violates the Constitution. Id. at 1259-61.[6]
Thompson compels us to conclude that the rule Ayala seeks is not, under Teague, a “new” one. “[C]ircuit court holdings suffice to create a ‘clearly established’ rule of law under Teague.” Belmontes v. Woodford, 350 F.3d 861, 884 (9th Cir.2003) (reversed on other grounds by Brown v. Belmontes, 544 U.S. 945, 125 S.Ct. 1697, 161 L.Ed.2d 518 (2005)); see Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O’Connor, J., for the Court) (“With one caveat, whatever would qualify as an old rule under our Teague jurisprudence will constitute ‘clearly established Federal law, as determined by the Supreme Court of the United States’ under § 2254(d)(1).... The one caveat, as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court’s jurisprudence.”). We have held that, as long as a rule derived from Supreme Court precedent was established in this Circuit when a petitioner’s conviction became final, it is not a “new rule” under Teague. See Belmontes, 350 F.3d at 884; Bell v. Hill, 190 F.3d 1089, 1092-93 (9th Cir.1999). “This is true even [if] other federal courts and state courts have rejected our holding.” Bell, 190 F.3d at 1093. Because Thompson itself relied on the Supreme Court’s right to counsel and equal protection jurisprudence, “we cannot now say that a state court would not have felt compelled by the Constitution and Supreme Court precedent” to conclude that the rule Ayala contends must be applied was not established at the time his conviction became final. Id.
C.
We would hold that Ayala’s claim is not Teague-barred even if we were free to conclude that,' contrary to Bell and Belmontes, Thompson did not in and of itself establish that the rule Ayala seeks is not “new.” Nearly every court to consider the question by the time Ayala’s conviction became final had adopted the rule that we set forth in Thompson, concluding that defense counsel must be allowed to participate at Batson steps two and three except when confidential or strategic reasons justify the challenge. The Fourth, Eight and Eleventh Circuits had all so held. See United States v. Garrison, 849 F.2d 103, 106 (4th Cir.1988) (“We ... agree with the *955 Ninth Circuit that the important rights guaranteed by Batson deserve the full protection of the adversarial process except where compelling reasons requiring secrecy are shown.”); United States v. Roan Eagle, 867 F.2d 436, 441 (8th Cir.1989) (“[Ojnce the prosecutor has advanced his racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation.”); United States v. Gordon, 817 F.2d 1538, 1541 (11th Cir. 1987) (remanding for an evidentiary hearing where the district court had denied the defendant’s request for a hearing to rebut the government’s proffered race-neutral reasons). The state courts that confronted the issue had all reached similar conclusions. See Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 203; Goode v. Shoukfeh, 943 S.W.2d 441, 452 (Tex.1997); People v. Hameed, 88 N.Y.2d 232, 238, 644 N.Y.S.2d 466, 666 N.E.2d 1339 (1996); State v. Hood, 245 Kan. 367, 378, 780 P.2d 160 (1989); Gray v. State, 317 Md. 250, 257-58, 562 A.2d 1278 (1989); Commonwealth v. Jackson, 386 Pa.Super. 29, 51, 562 A.2d 338 (1989); Commonwealth v. Futch, 38 Mass.App.Ct. 174, 178, 647 N.E.2d 59 (1995); see also Caspari v. Bohlen, 510 U.S. 383, 395, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (“[I]n the Teague analysis the reasonable views of state courts are entitled to consideration along with those of federal courts.”).
These courts adopted the Thompson rule with good reason. The Sixth Amendment provides that the defendant must be permitted to have the assistance of a trained advocate at all critical stages of the proceedings in order to test and challenge all aspects of the prosecution’s case. See Cronic, 466 U.S. at 656, 104 S.Ct. 2039. Batson did not suggest that there should be an exception to this overarching rule when a defendant has established a prima facie case that the prosecutor has struck jurors on the basis of race. To the contrary, it makes no sense to put the burden of persuasion on the defense, as Batson does, and then refuse defense counsel the opportunity to hear and respond to the prosecution’s explanations. The rule Ayala seeks is not in any sense new, but rather one which, as almost all courts to have considered the question have concluded, follows directly from the more general rule that the defendant has the right “to require the prosecution’s case to survive the crucible of meaningful adversarial testing.” Id.; see also Wright v. West, 505 U.S. 277, 308-09, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring in the judgment) (“Where the beginning point is a rule of ... general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.”).
The state and the dissent call our attention to two decisions that reached a contrary conclusion, both of which were decided soon after the Court issued Batson. In United States v. Davis, the Sixth Circuit rejected a defendant’s argument that his right to be present had been violated when the trial court allowed the prosecution to explain its peremptory strikes in camera, holding that “the district court was entitled to hear from the Government under whatever circumstances the district court felt appropriate.” 809 F.2d 1194, 1202 (6th Cir.1987). Similarly, in United States v. Tucker, the Seventh Circuit held that the Sixth Circuit was correct to conclude that “Batson neither requires rebuttal of the government’s reasons by the defense, nor does it forbid a district court to hold an adversarial hearing.” 836 F.2d 334, 340 (7th Cir.1988).[7]
*956 These decisions do not render Ayala’s claim Teague-barred. “[T]he standard for determining when a case establishes a new rule is ‘objective,’ and the mere existence of conflicting authority does not necessarily mean a rule is new.” Williams, 529 U.S. at 410, 120 S.Ct. 1495(quoting Wright, 505 U.S. at 304, 112 S.Ct. 2482 (1992) (O’Connor, J., concurring in the judgment)). To the extent that these decisions deny that there is any right to participate in Batson proceedings, they simply cannot be reconciled with the basic Sixth Amendment requirement that, at all critical stages of criminal proceedings, the defendant must have the assistance of counsel in order to subject the prosecution’s case to. adversarial testing. That the courts in Davis and Tucker failed to fully appreciate the relevance of this principle is understandable, as in neither case did the defendants invoke the right to counsel to support their claim: in Davis, the defendants asserted that the in camera hearings had violated their right to be present at trial, a right derived principally from the Sixth Amendment’s Confrontation Clause, see Davis, 809 F.2d at 1200; in Tucker, the defendant claimed that the ex parte proceedings violated his rights to due process and to an impartial jury, see Tucker, 836 F.2d at 338, 340. Perhaps for this reason, the Davis court failed to recognize the important functions counsel serves during Batson steps two and three, instead concluding that once the defense had established a prima facie case of racial discrimination, its “participation was no longer necessary for the district court to make its determination.” 809 F.2d at 1202. As we explained in Thompson, this statement is simply not true: defense counsel continues to serve the two crucial functions of bringing facts and arguments to the attention of the trial court and preserving them for the record. Thompson, 827 F.2d at 1260-61. Likewise, the court in Tucker rejected the rule we adopted in Thompson because it concluded that Batson itself did not require the defense to be present during Batson steps two and three, and because our exception permitting ex parte proceedings in some circumstances threatened to “swallow the rule.” See Tucker, 836 F.2d at 338, 340. Our rule is not, however, derived directly from Batson, but rather from the confluence of Batson and the Court’s Sixth Amendment jurisprudence. Moreover, simply because a rule is subject to an exception — perhaps even a relatively broad exception — is not a justification for rejecting the rule altogether when the result, in those cases in which the exception does not apply, is to deprive a defendant of his constitutional rights.[8]
*957 Even assuming some doubt may have existed as to whether the rule Ayala seeks was “dictated by precedent” in the immediate aftermath of the Sixth and Seventh Circuits’ decisions in 1987 and 1988, by the time Ayala’s conviction became final in 2001, 13 years later, every court to have considered the issue in the interim — state and federal — had rejected, either explicitly or implicitly, the Sixth and Seventh Circuits’ view, and had adopted the Thompson rule. See Garrison, 849 F.2d at 106; Roan Eagle, 867 F.2d at 441; Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 203; Goode, 943 S.W.2d at 452; Hameed, 88 N.Y.2d at 238, 644 N.Y.S.2d 466, 666 N.E.2d 1339; Hood, 245 Kan. at 378, 780 P.2d 160; Gray, 317 Md. at 257-58, 562 A.2d 1278; Jackson, 386 Pa.Super. at 51, 562 A.2d 338; Futch, 38 Mass.App.Ct. at 178, 647 N.E.2d 59. The Supreme Court had also, in the interim, acknowledged a version of our rule when it observed (in dicta) that, when a prosecutor challenges a defendant’s use of peremptory challenges, “[i]n the rare case in which the explanation for a challenge would entail confidential communications or reveal trial strategy, an in camera discussion can be arranged.” Georgia v. McCollum, 505 U.S. 42, 58, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Thus, the California Supreme Court characterized the rule Ayala sought — the Thompson rule — as one that had been “almost universally recognized.” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 203. Given that the California Supreme Court’s description is correct, the rule that Ayala would have us apply is not Teaguebarred.[9]
Accordingly, we conclude that, at the time Ayala’s conviction became final, it was established for purposes of Teague that defense counsel cannot be excluded from Batson steps two and three absent some “compelling justification” for doing so. *958 Thompson, 827 F.2d at 1259-60. The California Supreme Court held that this rule was violated in Ayala’s case. It found, and the state does not dispute, that “no matters of trial strategy were revealed” in the hearings at which the prosecution explained its reasons for its peremptory challenges of all the potential black and Hispanic jurors. Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 203.[10] Thus, the exclusion of defense counsel was in violation of the Constitution, and the only remaining question as to that aspect of the case is whether the constitutional error was prejudicial.
IV.
Ayala also claims that the state’s loss of an overwhelming majority of the jury questionnaires deprived him of a record adequate for appeal. As the California Supreme Court recognized, Ayala has a due process right to a record sufficient to allow him a fair and full appeal of his conviction. Id., 99 Cal.Rptr.2d 532, 6 P.3d at 208 (citing People v. Alvarez, 14 Cal.4th 155, 196 n. 8, 58 Cal.Rptr.2d 385, 926 P.2d 365 (1996)). If a state provides for a direct appeal as of right from a criminal conviction, it must also provide “certain minimum safeguards necessary to make that appeal ‘adequate and effective.’ ” Evitts v. Lucey, 469 U.S. 387, 392, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (quoting Griffin v. Illinois, 351 U.S. 12, 20, 76 S.Ct. 585, 100 L.Ed. 891 (1956)); see also Coe v. Thurman, 922 F.2d 528, 530 (9th Cir.1990) (“Where a state guarantees the right to a direct appeal, as California does, the state is required to make that appeal satisfy the Due Process Clause.”).
In Boyd v. Newland, we applied these principles in granting the habeas petition of an indigent defendant who had been denied a copy of his voir dire transcript because the state court had, in violation of clearly established federal law, determined that the transcript was not necessary to his Batson appeal. 467 F.3d 1139 (9th Cir.2006). We held that “all defendants ... have a right to have access to the tools which would enable them to develop their plausible Batson claims through comparative juror analysis.” Id., at 1150. It follows that if the state’s loss of the questionnaires deprived Ayala of the ability to meaningfully appeal the denial of his Bat-son claim, he was deprived of due process.[11]
*959 This conclusion is not called into question by Briggs v. Grounds, 682 F.3d 1165 (9th Cir.2012), cited in the dissent. Dissent at 982-83. In Briggs, the petitioner had complete access to the juror questionnaires during the course of his state appeal. In fact, he relied heavily on them in presenting a comparative juror analysis to support his Batson claim. 682 F.3d at 1171. Thus Briggs’s due process rights were not implicated. The language cited by the dissent is lifted from a section of the opinion discussing whether, because those questionnaires were not included in the federal court record, we should credit the petitioner’s characterization of those questionnaires over the state court’s characterization. Briggs is irrelevant for our purposes, i.e., whether Ayala’s due process rights were implicated when California lost the juror questionnaires, thus rendering them unavailable for his state court appeal.
Ayala is entitled to relief on this claim only if the loss of the questionnaires was prejudicial in se, or if it in conjunction with the Batson error discussed supra served to deprive him of a meaningful appeal. Id.; see also Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). “[I]n analyzing prejudice ..., this court has recognized the importance of considering the cumulative effect of multiple errors and not simply conducting a balkanized, issue-by-issue harmless error review.” Daniels v. Woodford, 428 F.3d 1181, 1214 (9th Cir.2005) (quoting Thomas v. Hubbard, 273 F.3d 1164, 1178 (9th Cir.2001)). Here, the loss of the questionnaires increased the prejudice that Ayala suffered as a result of the exclusion of defense counsel from Batson steps two and three, as it further undermined his ability to show that Batson had been violated. Accordingly, in determining whether Ayala is entitled to relief, we evaluate the prejudice caused by the loss of the questionnaires in conjunction with the harm caused by excluding defense counsel from the Bat-son proceedings.[12]
V.
The California Supreme Court held that Ayala was not prejudiced by the trial court’s exclusion of the defense from the Batson proceedings, by the state’s loss of the vast majority of the jury questionnaires, or by the two errors considered together. The Court declared itself “confident that the challenged jurors were excluded for proper, race-neutral reasons,” Ayala, 99 Cal.Rptr.2d 532, 6 P.3d at 204, concluded that the exclusion of defense counsel was “harmless beyond a reasonable doubt,” id. (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)), and held that despite the loss of the questionnaires the record was “sufficiently complete for [it] to be able to conclude that [the struck jurors] were not challenged and excused on the basis of forbidden group bias.” Id., 99 Cal.Rptr.2d 532, 6 P.3d at 208.
We now address these same questions, and hold that Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), requires us to reach a different conclusion.
A.
Ayala claims, first, that exclusion of defense counsel from the Batson proceedings necessarily represented structur *960 al error, and that he is entitled to relief without further inquiry into whether he was prejudiced. The state court’s conclusion that the error here was not structural — a conclusion implicit in its application of the Chapman harmless error standard to evaluate whether Ayala had suffered prejudice — is subject to review under the deferential standard of § 2254(d). See Byrd v. Lewis, 566 F.3d 855, 862 (9th Cir.2009).
The Supreme Court has defined as “structural” an error that affects “the framework within which the trial proceeds, rather than simply an error in the trial process itself.” Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Where this line is drawn is not always clear. Compare, e.g., Waller v. Georgia, 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (violation of the right to public trial requires automatic reversal), with, e.g., Rushen v. Spain, 464 U.S. 114, 117-18 & n. 2, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (denial of a defendant’s right to be present at trial is subject to harmless error review). While a violation of Batson is itself structural error, there is no Supreme Court decision addressing whether the exclusion of defense counsel from Batson proceedings constitutes structural error.
Ayala contends, however, that the state court’s decision represents an unreasonable application of the Supreme Court’s clearly established rule that “no showing of prejudice need be made “where assistance of counsel has been denied entirely or during a critical stage of the proceedings.’ ” Brief of Appellant at 22(quoting Mickens v. Taylor, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)); see also United States v. Cronic, 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).[13] The use of the phrase “critical stage” in this excerpt can be somewhat misleading: although the Batson proceedings represented a “critical stage” in the sense that Ayala had the right to counsel during those proceedings, they were not necessarily the sort of “critical stage” at which the deprivation of that right constituted structural error. See United States v. Owen, 407 F.3d 222, 227 (4th Cir.2005). As the Fourth Circuit has explained, the statements in Mickens and Cronic
rely on the Supreme Court’s earlier usage of the phrase “critical stage,” in cases such as Hamilton v. [Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) ] and White [v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (per curiam) ] to refer narrowly to those proceedings both at which the Sixth Amendment right to counsel attaches and at which denial of counsel necessarily undermines the reliability of the entire criminal proceeding.... [T]he Supreme Court has subsequently used the phrase “critical stage,” in cases such as [United States v.] Wade[, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ] and Coleman [v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) ], in a broader sense, to refer to all proceedings at which the Sixth Amendment right to counsel attaches— including those at which the denial of such is admittedly subject to harmless-error analysis.
Id. at 228 (emphasis omitted).
In Musladin v. Lamarque, we held that the “clearly established” rule of Cronic is that a “critical stage” where the deprivation of counsel constitutes structural error is one that holds “significant consequences for the accused.” 555 F.3d 830, 839 (9th Cir.2009) (quoting Bell v. Cone, 535 U.S. 685, 695-96, 122 S.Ct. 1843, 152 L.Ed.2d *961 914 (2002)). We identified as providing guidance in this inquiry Supreme Court decisions holding an overnight trial recess and closing arguments to be two such critical stages. Id. at 839-40 (citing Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) and Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)).
Given this fairly ambiguous standard, it was not an unreasonable application of clearly established federal law for the California Supreme Court to conclude that the exclusion of the defense from Batson steps two and three does not amount to a deprivation of the right to counsel such that the likelihood that the jury was chosen by unconstitutional means is “so high that a case-by-case inquiry is unnecessary.” Mickens, 535 U.S. at 166, 122 S.Ct. 1237. As the state points out, it would be somewhat incongruous to conclude that the exclusion of counsel during Batson proceedings is a defect in the very structure of the trial if the same exclusion would be permissible were there some reason to keep the prosecution’s justifications confidential. Thus, a “fairminded jurist[],” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)), might conclude that Batson steps two and three are not a Cromc-type “critical stage.” Even if we would hold the error to be structural were we to consider the issue de novo, we cannot say that, as the Supreme Court has construed AEDPA, the state court’s contrary conclusion was unreasonable. See Musladin, 555 F.3d at 842-43.
B.
Ayala claims next that, even if the trial court’s exclusion of the defense was not the sort of constitutional error in se that requires that we presume that in every exclusion case prejudice ensued, it was prejudicial in his case, especially when considered in conjunction with the loss of the questionnaires. In evaluating whether a trial error prejudiced a state habeas petitioner, we must apply the standard set forth in Brecht v. Abrahamson, granting relief only if the error had a “substantial and injurious effect or influence in determining the jury’s verdict.” 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). We “apply the Brecht test without regard for the state court’s harmlessness determination.” Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir.2010) (citing Fry v. Pliler, 551 U.S. 112, 121-22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007)).[14]
The Brecht standard has been described as follows:
*962 [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.
Merolillo v. Yates, 663 F.3d 444, 454 (9th Cir.2011) (quoting Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239). “Where the record is so evenly balanced that a judge ‘feels himself in virtual equipoise as to the harmlessness of the error’ and has ‘grave doubt about whether an error affected a jury [substantially and injuriously], the judge must treat the error as if it did so.’ ” Id. (quoting O’Neal v. McAninch, 513 U.S. 432, 435, 437-38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)) (alteration in original) (internal quotations omitted).[15]
We conclude that Ayala has met the Brecht standard. The prejudice he suffered was the deprivation of the opportunity to develop, present, and likely prevail on his Batson claim. Had he pre *963 vailed on his Batson claim, and shown that the prosecution acted upon impermissible considerations of race in striking even one of the seven black or Hispanic jurors it struck, then, as the state acknowledged in oral argument before this court, we would be compelled to reverse Ayala’s conviction because his entire trial would have been infected by this violation of the Constitution. See Vasquez v. Hillery, 474 U.S. 254, 263-64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); Boyd, 467 F.3d at 1150. The question, then, is whether Ayala could have made this showing but for the state’s constitutional errors. If we cannot say that the exclusion of defense counsel and the loss of the questionnaires likely did not prevent Ayala from prevailing on his Bat-son claim, then we must grant the writ.
Here, it is probable that the state’s errors precluded Ayala from turning what is a very plausible Batson claim — the challenge to the prosecution’s strikes of all minority jurors — into a winning one by preventing defense counsel from performing the two “crucial functions” we identified in Thompson. First, Ayala’s counsel could have pointed out where the prosecution’s purported justifications might be pretextual or indicate bad faith. Although the trial judge may have been able to “detect some of these deficiencies by himself, ... there might be arguments [he] would overlook” because he was “unassisted by an advocate.” Thompson, 827 F.2d at 1260-61. The jury selection process took over three months and comprises more than six thousand pages of the record. The trial judge, attempting to evaluate the prosecution’s reasons for striking the jurors in light of this massive amount of information, was almost certain to forget or overlook key facts, but could have been substantially aided by the presence of participants in the process adverse to the prosecution. In particular, Ayala’s lawyers could have pointed out when the prosecutor’s proffered reason for striking a black or Hispanic juror applied “just as well to an otherwise-similar non-black [or non-Hispanic] who [was] permitted to serve.” Miller-El v. Dretke, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). The Supreme Court has emphasized the importance of this sort of “comparative juror analysis” to determining whether a prosecutor’s reasons for challenging a minority juror were pretextual. Id.; see also Snyder v. Louisiana, 552 U.S. 472, 483-85, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). Although Ayala can— and does — still raise some of these arguments on appeal, he was deprived of the crucial opportunity to present them to the institutional actor best positioned to evaluate them. As the Supreme Court has observed, appellate courts must accord deference to “trial court findings on the issue of discriminatory intent” because “the finding largely will turn on evaluation of credibility.” Miller-El v. Cockrell, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting Hernandez v. New York, 500 U.S. 352, 366, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)) (internal quotation marks and citations omitted). Because, after finding a prima facie case of a Batson violation, the trial court was not made aware of key facts that could have influenced his credibility determination, there is substantial reason to doubt that Ayala’s Batson challenge was properly denied.
Second, Ayala’s counsel could have “preserve[d] for the record, and possible appeal, crucial facts bearing on the judge’s decision.” Thompson, 827 F.2d at 1261. We cannot know many of the facts material to whether the prosecution’s stated reasons were false, discriminatory or pretextual because defense counsel was not able to preserve relevant facts regarding prospective jurors’ physical appearances, behavior, or other characteristics. Although the trial judge could have been aware of these facts, an appellate court “can only *964 serve [its] function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after learning of the prosecutor’s reasons.” Id.; see also United States v. Alcantar, 897 F.2d 436, 438 (9th Cir.1990) (reversing a defendant’s conviction where the Batson proceedings conducted below left the defense unable “to adequately challenge the prosecution’s reasons as pretextual” and left the reviewing court uncertain as to whether the prosecution had, in fact, violated Batson).
This second deficiency is greatly augmented by the loss of the jury questionnaires. The only questionnaires that have been preserved are those of the seated and alternate jurors.[16] We are unable to evaluate the legitimacy of some of the prosecution’s proffered reasons for striking the black and Hispanic jurors because they referred to questionnaires that are now lost. The loss of the questionnaires also leaves us lacking potentially crucial information about certain individuals who were neither the subject of Ayala’s Batson challenge nor ultimately served as jurors.[17] Thus, we cannot perform a fair comparative juror analysis as required by Batson. See Miller-El v. Dretke, 545 U.S. at 241, 125 S.Ct. 2317.
Even so, we have substantial reason to question the motivation of the prosecution in engaging in its peremptory challenges of the black and Hispanic jurors. In conducting our inquiry, we must keep in mind the strength of Ayala’s prima facie case. “[T]he statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors.” Miller-El v. Cockrell, 537 U.S. at 342, 123 S.Ct. 1029. That the prosecution struck each of the seven black or Hispanic jurors available for challenge establishes a basis for significant doubt of its motives: “[h]appenstance is unlikely to produce this disparity.” Id.
Perhaps more important, the analysis of the prosecution’s motives that is possible on the partial record before us demonstrates that many of its stated reasons for striking the seven black and Hispanic jurors were or may have been false, discriminatory or pretextual. There are good reasons to think that race motivated the prosecution’s strikes of at least three, if not more, jurors: danders D., Gerardo 0. and Robert M.[18] We “cannot say, with *965 fair assurance, after pondering all that happened without stripping the erroneous action from the whole,” Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239, that Ayala was not prevented from showing that the prosecution struck at least one of these jurors because of his race.

1. Olanders D.

Olanders D. was one of two black jurors whom the prosecution struck in the first round of peremptory challenges. During the in camera hearing that followed the defense’s Batson motion, the prosecutor explained that he struck Olanders D. because: (1) he might not be able to vote for the death penalty, as he had written in his questionnaire that he did not believe in it, and he had indicated in questioning that his view had recently changed; (2) his answers to voir dire questions often were not fully responsive; (3) his questionnaire responses had been “poor”; and (4) he might lack the “ability to fit in with a cohesive group of 12 people.” The trial judge rejected one of the four proffered reasons — his purported inability “to fit in with a cohesive group of 12 people.” The presence of defense counsel, and the preservation of the questionnaires, could have permitted Ayala to call into question all three of the reasons that the court accepted as legitimate.
First, in response to the prosecution’s claim that it was concerned that Olanders D. would hesitate to impose the death penalty, defense counsel could have pointed to seated white jurors who had expressed similar or greater hesitancy. One seated juror in particular was indistinguishable from Olanders D. in this regard. Olanders D. had (apparently) written in his questionnaire that he did not believe in the death penalty. Ana L., a seated white juror, made almost precisely the same statement in her questionnaire, writing that she “probably would not be able to vote for the death penalty.” Also, Olanders D. later said during voir dire that he had reconsidered his views, and affirmed that he could be “personally responsible for being on a jury and actually voting for the death penalty.” Once again, Ana L. said almost precisely the same thing: she stated that she had since rethought her position, and affirmed that she could “actually vote” for the death penalty.[19]
Second, in answer to the prosecution’s purported concern that Olanders D.’s answers on voir dire were not always fully responsive, defense counsel could have questioned the validity of this assessment, suggested that his answers were in fact fully responsive, and pointed to seated white jurors whose answers were less responsive than Olanders D.’s. Our review of the voir dire transcript reveals nothing *966 that supports the prosecution’s claim: danders D.’s answers were . responsive and complete. In order to make this fact clear to the trial judge, defense counsel could once again have compared danders D. to seated juror Ana L. Ana L. had, for example, responded “That is correct” to a question asking “why” she would prefer not to sit as a juror, .stared blankly at defense counsel in response to a question on the presumption of innocence, and failed, at various points, to respond directly to yes or no questions.
Third, we cannot know exactly what arguments defense counsel could have made to undermine the prosecution’s final reason for striking danders D. — that his questionnaire responses were “poor,” and demonstrated his inability to express himself. Because danders D.’s questionnaire has been lost, we may only speculate as to its contents. If the reason his answers were “poor” was that they were not particularly detailed, the defense could have compared his questionnaire to that of Ana L., whose answers were brief and often incomplete, or to that of Charles G., a seated white juror whose responses to the 77 questions were rarely longer than two or three words apiece. If the reason his answers were poor was that they reflected an inability to think clearly or express complex thoughts, the defense could have compared his questionnaire to that of Thomas B., a seated white juror who, for example, opined of street gangs, “I feel the only media coverage they get is bad, however, those whom do constructive events usually seek out positive media coverage.” Further, this is an obvious instance in which the defense is prejudiced by being unable to compare Olanders D.’s answers to those of prospective white jurors who were accepted by the prosecution but struck by the defense, and whose questionnaires have been lost.[20] It is also, of course, possible that Olanders D.’s answers were not poor at all. We have no way of knowing.
Thus, one of the four reasons given by the prosecution for striking this prospective juror was determined to be without merit by the trial judge; two failed to distinguish the juror whatsoever from at least one seated white juror; and the fourth and final reason the prosecution gave for striking the juror cannot be evaluated because his questionnaire was lost, as were those of the prospective white jurors struck by the defense. Given the objective reasons that we have even on this record to question the validity of the prosecution’s explanations for striking Olanders D., we simply. cannot conclude that it is likely that, if the defense had been present during the Batson proceedings and if the lost questionnaires had been preserved, Ayala *967 would not have been able to show that the prosecution’s stated reasons for striking Olanders D. were pretextual, and that the actual reasons were racial.

2. Gerardo 0.

Gerardo 0. was one of two Hispanic jurors the prosecution challenged during the second round of peremptories. He was struck, the prosecutor explained in the subsequent ex parte proceeding, because: (1) he was “illiterate,” and had needed the questionnaire to be translated for him; (2) he “appeared not to fit in with anyone else,” was “standoffish,” with “dress and mannerisms ... not in keeping with the other jurors,” and “did not appear to be socializing or mixing with any of the other jurors”; and (3) his voir dire responses suggested that he was not sure “if he could take someone’s life,” and that he “felt a little shaky as far as his responsibilities in this case.” The trial judge concluded that the “record document[ed] the factors that were indicated” by the prosecutor and accepted his explanation.
Once again, had the defense not been excluded from the Batson proceedings, it likely could have called into question all of the prosecution’s stated reasons for striking Gerardo 0. Defense counsel could have first argued that one reason given — that Gerardo 0. was illiterate — was itself indicative of the prosecution’s discriminatory intent. Although Gerardo 0. did need someone to fill out the questionnaire for him, the record reveals that he was not, in fact, illiterate, but simply had difficulty writing in English. Gerardo 0. had been born in Mexico and was not a native English speaker, but he had graduated from high school and attended college in the United States, and was perfectly capable of reading the summary of legal issues that was given to prospective jurors before voir dire questioning. As he explained at voir dire, he did not fill out the questionnaire himself because he was concerned about his English spelling. The prosecution’s purported reason for striking Gerardo 0., then, was directly related to his status as someone who spoke Spanish as his first language. Thus, as the Supreme Court observed in a similar circumstance, “the prosecutor’s frank admission that his ground for excusing th[is] juror[ ] related to [his] ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact [was a] race-based peremptory challenge[ ].” Hernandez, 500 U.S. at 363, 111 S.Ct. 1859 (plurality opinion). Defense counsel’s presence was necessary to point out the potential inferences to the trial judge and urge the judge to adopt the one most appropriate here.
An inference of racial bias might also have been drawn from the prosecutor’s claim that Gerardo 0. was challenged because he did not dress or act like other jurors, and did not mix or socialize with them. It is likely that Gerardo O.’s dress and mannerisms were distinctly Hispanic. Perhaps in the late 1980s Hispanic males in San Diego County were more likely than members of other racial or ethnic groups in the area to wear a particular style or color of shirt, and Gerardo 0. was wearing such a shirt (and for this reason did not “fit in,” in the prosecutor’s mind, with the other jurors). If so, and if defense counsel were able to bring this fact to the trial court’s attention, the prosecution’s explanation that it struck Gerardo 0. because of his dress and mannerisms would provide compelling support for Ayala’s claim that the strike was actually racially-motivated. See id. (“[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.”) (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. *968 2040, 48 L.Ed.2d 597 (1976)). If present at the hearing, defense counsel could have made a record that would have strongly supported these claims.
Even if Gerardo O.’s clothes and behavior were in no way correlated with his race, defense counsel might have been able to show the prosecution’s explanation to be pretextual. Defense counsel might have pointed to other jurors the prosecution had not struck who had similar characteristics — perhaps, for example, a seated white juror had actually worn an outfit identical to Gerardo O.’s. Defense counsel might also have been able to challenge the factual basis for the prosecution’s claim — perhaps, unbeknownst to the trial judge, Gerardo 0. did “socializ[e] or mix[ ]” with a number of other jurors, and had even organized a dinner for some of them at his favorite Mexican restaurant.
We can only speculate as to whether or how Ayala could have shown this explanation for striking Gerardo 0. to be facially discriminatory, false or pretextual because we know nothing about his dress or mannerisms, or that of the other prospective jurors. These are exactly the sort of physical and behavioral observations that the defense could have preserved for the record had it been permitted to hear and respond to the prosecution’s explanations for challenging Gerardo 0. Although we might hope that the trial judge would have noticed if Gerard 0. had been wearing a shirt worn only by members of the Hispanic community, or had been dressed identically to other prospective jurors whom the prosecution had not challenged, or had in fact been socializing with other jurors, “we cannot affirm simply because we are confident he must have known what he was doing.” Thompson, 827 F.2d at 1261.
Finally, in response to the prosecution’s third reason for the strike — that Gerardo 0. seemed reluctant to impose the death penalty — defense counsel could have demonstrated this reason to be pretéxtual through comparisons to jurors the prosecution did not strike. Gerardo 0. had stated during voir dire that “I’m not sure if I can take someone’s life in my hand and say ... you know, ‘death,’ or something,” but he soon thereafter affirmed that he “could vote for the death penalty.” This statement was indistinguishable from those made by a number of seated white jurors. Dorothy C. said in voir dire that serving as a juror in a capital case would cause her to “worry a lot” because it was “a lot of responsibility,” gasped when defense counsel told her that as a juror she would “decide the sentence,” and stated, “I’ve never had to vote on a death penalty. That might be a little bit difficult when it came right down to it, but I’d say I’m for it.” Likewise, Dorothy H., when asked in voir dire if she could return a verdict of death, stated, “I don’t think it would be an easy thing for anyone, but I don’t — I think I could do it if I felt it was the thing to do.” Dorothea L. was even more hesitant, saying, when asked the same question, “I think so, but I don’t know until I have to do it.” Finally, Leona B., when asked by the prosecutor if having the responsibility for imposing the death penalty would “bother” her, responded, “Yes, I think so. I think — I think one should be affected ... by that. I don’t think it’s anything to be taken lightly.” Certainly, Gerardo 0. expressed less hesitancy than Ana L., who had flatly stated on her questionnaire that she “probably would not be able to vote for the death penalty” before subsequently changing her mind. Further, prospective white jurors accepted by the prosecution but struck by the defense might have expressed similar sentiments in their jury questionnaires. We cannot tell, because these questionnaires have been lost.
Thus, one of the reasons given by the prosecution for striking this prospective juror could have itself given rise to an *969 inference of discriminatory intent. A second reason cannot be evaluated because defense counsel was excluded from the Batson proceedings and could not preserve for the record certain crucial facts. The third reason given failed to distinguish Gerardo 0. from seated white jurors the prosecutor chose not to strike, as well as, possibly, from other prospective white jurors struck not by the prosecution but by the defense. Given the cause we have to question the validity of the prosecution’s reasons that can be evaluated on this record, we cannot say that Ayala would not have shown that the trial court would or should have determined that the prosecution’s strike of Gerardo 0. violated Batson.

3. Robert M.

The prosecution struck Hispanic juror Robert M. in the final round of peremptory challenges. In camera, the prosecutor explained that he had been concerned, given Robert M’s response to voir dire questioning, that he might not be willing to impose the death penalty. This concern had been heightened by Robert M.’s mentioning the Sagon Penn case — a case in which the defendant was found not guilty in a second trial and the police and the district attorney’s office were accused of misconduct. The trial judge accepted the prosecution’s explanation, stating that, although Martinez’s “questionnaire would tend to indicate a person that is certainly pro the death penalty[,] ... his answers varied somewhat to the extent that individually, there may well be a legitimate concern as to whether or not he could impose it.”
Defense counsel’s presence in the Bat-son proceedings was necessary to call into question the prosecution’s claim that it struck Robert M. because of his reluctance to impose the death penalty. Even without comparing Robert M. to other jurors permitted to serve, this explanation is highly suspect: Robert M. repeatedly stated during voir dire that he believed in the death penalty and could personally vote to impose it, and his questionnaire (which has, of course, been lost) manifested a similar enthusiasm according to the trial judge. Defense counsel could have brought to the trial court’s attention that the only statement potentially raising any question whatsoever — that voting for a death sentence might “weigh on his conscience,” and would be a “heavy” decision — was indistinguishable from a practical standpoint from statements by Dorothy C, who said that serving as juror in a capital case was “a lot of responsibility” and would cause her to “worry a lot,” Dorothy H., who stated that imposing the death penalty would not “be an easy thing for anyone,” Dorothea L., who said she would not know if she could impose the death penalty until she had to do it, and Leona B., who affirmed that this responsibility would “bother” her. Other prospective jurors who were struck by the defense, but had been accepted by the prosecution, may have made comparable statements in their questionnaires (which, again, have been lost). Counsel could have argued that most jurors who believed in imposing the death penalty would consider a decision to do so a “heavy” decision that would weigh on one’s conscience. Following counsel’s argument, the judge might well have recognized that there is indeed rarely a “heavier” decision a citizen is ever asked to undertake. Certainly, like Gerardo 0., Robert M. was no more hesitant than Ana L., who had actually at one point stated that she would be unable to impose the death penalty.
To the extent that the prosecution gave Robert M’s reference to the Sagon Penn case as a separate reason for its challenge, defense counsel could likely have demonstrated that this reason was pretextual. *970 First, the entirety of the Sagon Penn exchange was as follows:,
Prosecutor: Have you followed any kind of — any court cases in the news or come downtown to watch any trials?
Robert M.: Well, I followed the Saigon [sic] Penn case.
Prosecutor: All right.
Robert M. briefly mentioned the case in response to the prosecution’s question, and he said nothing about any accusations of police or prosecutorial misconduct.
Second, although none of the seated jurors had been asked a similar question, one seated white juror had on his own initiative referred to a far more controversial capital case. When asked to describe his feelings about the death penalty, Douglas S. mentioned the “Harris” case, saying: “The Harris case, which goes back.... I believe he’s on death row ... I can’t even recall the exact crimes, but I remember them to be quite bizarre, and — and here he was, facing execution, and I don’t know.” Douglas S. was presumably referring to Robert Alton Harris, who at the time of Ayala’s trial was on California’s death row, and had, in a case that was extensively covered by the press, been tried, convicted and sentenced to death in San Diego. People v. Harris, 28 Cal.3d 935, 171 Cal.Rptr. 679, 623 P.2d 240, 246 (1981). As Harris’s case wound its way through the state and federal courts, it generated substantial controversy, some of which, as in the Sagon Penn case, was related to allegations of official misconduct. See, e.g., id., 171 Cal.Rptr. 679, 623 P.2d at 267 (Bird, C.J., dissenting) (arguing that Harris had been denied his right to a fair trial due to extensive and prejudicial pretrial publicity, partially the product of the “sorry spectacle of prosecutorial offices publicly vying with each other to have ‘first crack’ at convicting the accused”); see also Stephen R. Reinhardt, The Supreme Court, The Death Penalty, and The Harris Case, 102 Yale L.J. 205, 205 & n.l (1992) (for further description of controversy generated by case). Douglas S.’s statement about the case — “here he was, facing execution, and I don’t know” — suggests that this controversy had created some doubt in his mind as to the propriety of Harris’s conviction and sentence. Certainly, Douglas S.’s unelicited discussion of the Harris case should have troubled the prosecutor far more than Robert M.’s brief direct response regarding the Sagon Penn case.
Finally, if there was any inference to draw from Robert M’s fleeting reference to the Sagon Penn case, it was that Robert M. would not return a guilty verdict based on a blind trust of the police and the prosecution who had arrested and charged the defendant with the crime. Numerous seated white jurors expressed similar sentiments. Douglas S., for example, stated that the' last person who had lied to his face was a California policeman. Similarly, Charles C. said, “You don’t change your stripes ... when you put on a badge; and you have to judge everybody’s testimony in a court case on its face.”
Even if the trial judge had not been willing to completely reject the prosecution’s implausible explanation that it struck Robert M. because he mentioned the' Sagon Penn case, there is a strong likelihood that, had defense counsel been present and been able to persuade the court that the prosecution’s principal reason for challenging this juror — his reluctance to impose the death penalty — was pretextual, the court would have concluded that the strike violated Batson. We thus cannot conclude that the exclusion of defense counsel from the Batson proceedings did not prevent Ayala from showing that the prosecution’s strike of Robert M. was based on its impermissible consideration of race.
*971 Although each of the reasons offered by the prosecution for challenging the black and Hispanic jurors discussed above could have been shown to be pretextual had defense counsel been allowed to participate at steps two and three of the Batson proceedings and had the questionnaires of the vast majority of jurors been preserved, it is not necessary that all of the reasons advanced by the prosecution be pretextual or be shown to be pretextual. Notwithstanding the existence of some apparently appropriate reasons, “if a review of the record undermines ... many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.” Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir.2006) (en banc) (quoting Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir.2003)) (emphasis added). In short, “[a] court need not find all nonracial reasons pretextual in order to find racial discrimination” with respect to any particular juror, and the exclusion of any one juror in violation of Batson requires reversal of the verdict. Id.
C.
Because the defense was excluded from the Batson proceedings, it could not bring necessary facts and arguments to the attention of the trial judge, the institutional actor best positioned to evaluate the prosecution’s credibility and to determine if its proffered reasons for striking the minority jurors were its actual and legitimate reasons. Because the defense was excluded from the Batson proceedings, and because the vast majority of the juror questionnaires were lost, the appellate courts reviewing this case cannot engage in a proper comparative juror analysis, or know what other facts and arguments might be employed to demonstrate that the proffered reasons were false, facially discriminatory and pretextual.
Even on this deficient record, Ayala’s Batson claim is compelling: the prosecution struck all seven of the black and Hispanic jurors in a position to. serve on the jury, and many of its proffered race-neutral reasons are highly implausible. Given the strength of Ayala’s prima facia case, the evidence that the prosecution’s proffered reasons were false or discriminatory, the inferences that can be drawn from the available comparative juror analysis, and the deficiencies in the record that are themselves the product of the state’s constitutional errors, it is “impossible to conclude that [Ayala’s] substantial rights were not affected” by the exclusion of defense counsel from the Batson proceedings and the loss of the juror questionnaires. Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239. Ayala has suffered prejudice under Brecht, and is entitled to relief.
VI.
Our dissenting colleague makes three assertions that are fundamental to her disagreement with our opinion. All are plainly erroneous and illustrate her misunderstanding of the nature of our holding. First, the dissent suggests that, because the trial court accepted the prosecutor’s rationale for striking these jurors, deference to its ruling is required under AED-PA, citing Rice v. Collins, 546 U.S. 333, 338-39, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). Dissent at 984-86. Along similar lines, the dissent accuses us of failing to give the state court decision the “benefit of the doubt,” citing Felkner v. Jackson, - U.S. -, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011). Dissent at 989-90. Second, the dissent assumes that Ayala must demonstrate that the individual jurors were struck for racial reasons by “clear and convincing evidence,” citing 28 U.S.C. § 2254(e)(1). Dissent at 983. Third, the dissent makes the bizarre prediction that “[u]nder this approach all Bat-son challenges in federal habeas petitions *972 must be granted because no one can disprove a negative.” Dissent at 973.
Each of these assertions assumes, incorrectly, that we are confronting an ordinary Batson challenge on habeas review — a challenge to the holding in a case in which defense counsel was able to present arguments to the trial court regarding racial bias, appeal that claim to the state appellate court, .and subsequently seek reversal in federal court of the judgment that none of the jurors was struck by the prosecution for impermissible racially motivated reasons. Rice and Felkner are precisely such cases. The Supreme Court has emphasized, in such cases, that deference is required, that the petitioner must demonstrate his factual claims of prosecutorial bias by clear and convincing evidence, and that we may not give the petitioner the benefit-of-the-doubt with regard to the existence of racial prejudice. However, this case is not an ordinary Batson challenge, and for the reasons we have explained supra the dissent’s approach is both inapplicable and wholly inappropriate. This, as the dissent consistently ignores, is a case in which the challenge is to the procedure employed by the trial court in conducting the Batson inquiry — a procedure that resulted in the denial of a fair Batson hearing to the defendant.
We cannot defer to the trial court where procedural error (such as the state supreme court found here) has rendered the trial court’s determination unreliable. Ayala’s counsel was excluded from Batson stages two and three, thus depriving him of the opportunity to persuade the trial judge that the prosecutor was motivated by racial bias. Even a very capable trial judge may overlook or fail to understand the arguments supporting racial motivation “if unassisted by an advocate.” Thompson, 827 F.2d at 1261. Because the procedures designed to ensure a fair hearing to the defendant were not followed, we cannot afford deference to the trial court’s determination of the merits of the Batson claim. As we concluded in Thompson, we “cannot rely on ... such fundamentally flawed procedures to show that that defendant suffered no prejudice.” Id. at 1261.
Next, for similar reasons, the “clear and convincing evidence” standard has no role with regard to Ayala’s challenge. The dissent’s position is inherently at odds with the statutory authority on which it relies. That AEDPA provision reads as follows:
In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. '
28 U.S.C. § 2254(e)(1). We have previously held, in interpreting § 2254(e)(1), that “the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court’s fact-findings survive any intrinsic challenge.” Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir.2004) (emphasis added) (cited by but expressly not overruled in Wood v. Allen, 558 U.S. 290, 130 S.Ct. 841, 848-49 & n. 1, 175 L.Ed.2d 738 (2010)). In Taylor, we explained that a state court factual finding is intrinsically flawed if “the process employed by the state court is defective,” Id. at 999 (citing Nunes v. Mueller, 350 F.3d 1045, 1055-56 (9th Cir.2003)). Here, the state admitted that precluding Ayala’s counsel from establishing a Batson violation at stages two and three of the state’s trial court proceeding constituted procedural error. Under Taylor, because the state court proceeding is flawed, it is not entitled to a presumption of correctness, and Ayala is not required to demonstrate his Batson claim by clear and con *973 vincing evidence. The dissent’s assertion is contrary to AEDPA and to Taylor and would simply erect an insurmountable barrier that would protect the conceded error against any effective federal review.
Finally, although the dissent accuses us of changing the approach in “all Batson challenges,” this plainly misstates the nature of our holding. This is not a Batson challenge in the usual sense, but rather a procedural challenge to the exclusion of counsel from Batson stages two and three. Perhaps even more important, our dissenting colleague apparently fails to recall that error has been conceded by the state. The only issue here is prejudice — i.e., the effect of that error upon the petitioner’s opportunity to show the prosecutor’s bias. This could not be more different from the traditional Batson challenge, where prejudice is structural and proof of constitutional error requires reversal without any showing of prejudice. Thus, ordinary Bat-son cases are only about constitutional error and not at all about prejudice, whereas Ayala’s case is all about prejudice and not at all about the conceded error. Accordingly, what we hold here could not possibly require that “all Batson challenges in federal habeas petitions must be granted.” To put it mildly, that contention is entirely without any rational basis whatsoever.[21]
VII.
We hold that the exclusion of defense counsel during Batson steps two and three constitutes prejudicial error. We cannot say that had counsel been permitted to participate in the Batson proceedings, and had the state not lost the vast majority of the jury questionnaires, Ayala would have been unable to show that the prosecution violated Batson. To the contrary, constitutional error on the part of the state likely prevented Ayala from showing that the prosecution utilized its peremptory challenges in a racially discriminatory manner, and thus permitted him to be tried, convicted, and sentenced to death by a jury selected in a manner repugnant to the Constitution. Accordingly, we reverse the judgment of the district court, and remand with instructions to grant the writ and order that Ayala be released from custody unless the state elects to retry him within a reasonable amount of time to be determined by the district court.
REVERSED and REMANDED.

. The motions were technically made under People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), the California analogue to Batson. Because “a Wheeler motion serves as an implicit Batson objection,” we characterize Ayala's motions, and the proceedings that followed, as being pursuant to Batson. Crittenden v. Ayers, 624 F.3d 943, 951 (9th Cir.2010).

. Because we conclude that Ayala is entitled to relief on his Batson-related claims, we need not decide whether the district court erred in rejecting his Vienna Convention claim.

. We do, however, accord AEDPA deference to the state court’s reason for ultimately denying Ayala's appeal: that he had not been prejudiced by the trial court’s error. We also agree with the state’s contention that AEDPA bars Ayala's argument that the exclusion of defense counsel from steps two and three of the Batson proceedings was structural error. See infra Part V.

. Teague is subject to two exceptions. See Saffle v. Paries, 494 U.S. 484, 494-95, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (a "new rule” can be applied retroactively on collateral review if "the rule places a class of private conduct beyond the power of the State to proscribe,” or if it constitutes a " 'watershed rule[] of criminal procedure’ implicating the fundamental fairness and accuracy of the criminal proceeding”) (quoting Teague, 489 U.S. at 311, 109 S.Ct. 1060). Neither party contends that either exception is applicable in this case.

. The dissent suggests that, because Thompson declined to adopt an absolute rule regarding the exclusion of defense counsel from Batson steps two and three, its conclusion was "not ... a binding rule” and "clearly advisory.” Dissent at 976. We are puzzled by this, almost as much as we are by the dissent’s suggestion that because Thompson was not unanimous it does not have binding effect and we should follow Judge Sneed’s dissent. In any event, many constitutional rules recognize exceptions — e.g., the exigency exception to the Fourth Amendment prohibition on warrantless searches — but that does not make the rules any less binding.

. The state and the dissent, in arguing that Ayala’s claim is barred by Teague, cite Lewis v. Lewis, 321 F.3d 824 (9th Cir.2003), a case in which we granted a habeas petitioner's Batson claim. In the course of some extended musings regarding the “ideal procedures under Batson,” id. at 830, the Lewis panel observed, in a footnote, that the argument that “a court must allow defense counsel to argue” at Batson step three was not “clearly established law,” as it "appears not to have been addressed by courts.” Id. at 831 n. 27. This passage is dicta, as the question of whether defense counsel must be permitted to argue at Batson step three was not “presented for review” in Lewis. Barapind v. Enomoto, 400 F.3d 744, 750-51 (9th Cir.2005) (en banc) (per curiam). Indeed, this passage could not represent anything but dicta, as the Lewis panel could not overrule our prior decision in Thompson, of which it was apparently unaware. See Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir.2003) (en banc) (holding 'that a prior panel’s decision may only be overruled by a subsequent panel if the decision is "clearly irreconcilable” with a higher court’s intervening ruling). Thompson’s holding thus unquestionably remains binding Circuit law.

. The state and the dissent also cite a third decision that they contend demonstrates that there is a Circuit split that precludes our finding that the rule Ayala seeks was "dictat *956 ed by precedent.” In Majid v. Portuondo, where the issue was whether the defense had the right to cross-examine witnesses at a Bat-son hearing, the Second Circuit remarked gratuitously that ”[i]t remains at least arguable that courts holding Batson hearings may ... hear the [prosecution’s] explanations in camera arid outside the presence of the defendants.” 428 F.3d 112, 128 (2d Cir.2005). The question of whether a challenge to the type of in camera hearing conducted in Ayala's case is Teague-barred was not, however, before the court. Moreover, this passage in Majid can be understood as observing only that there is no absolute right to an adversarial proceeding, which is consistent with the rule that Ayala seeks here.

. Tucker itself may be read to recognize this point, as it did not explicitly reject our conclusion that an adversarial hearing at Batson ■ steps two and three was sometimes constitutionally compelled. Id. at 340. It observed that, in general, "adversarial hearings are the most appropriate method for handling most Batson-type challenges.” Id. Thus, although the Tucker court purported to reject Thompson in favor of Davis, the decision did not necessarily foreclose defendants from claiming their rights had been violated by the trial court's employment of a nonadverserial Bat-son proceeding.

. We also note that where, as here, the state court applied the rule in question on direct appeal, and determined it to be “almost universally recognized,” the application of Teague to bar the petitioner’s claims would do little to further the doctrine’s purpose. Teague is motivated by considerations of comity and finality. See Teague, 489 U.S. at 308, 109 S.Ct. 1060. Its purpose is to afford repose to the states by ensuring that criminal convictions that were valid at the time they became final will not be upset by subsequently discovered constitutional rules. As Justice O’Con-nor explained, applying new rules on collateral review
continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then existing constitutional standards. Furthermore, as we recognized in Engle v. Isaac, "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands.” [456 U.S. 107, 128 n. 33, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).]
Id. at 310, 109 S.Ct. 1060. Although Teague may still bar the application in federal habeas proceedings of rules that the state courts have themselves recognized, cf. Beard v. Banks, 542 U.S. 406, 413, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004), Horn, 536 U.S. at 272, 122 S.Ct. 2147, the interests of comity and finality are obviously far less weighty when a state court has accepted a rule than when it has rejected or ignored a rule. Here, the state is not being forced to marshal resources to defend against a new and novel claim that was not recognized at the time the conviction became final; nor did it faithfully apply existing constitutional law only to have a federal court subsequently apply new constitutional commands. To the contrary, the state is challenging a rule that the California Supreme Court found to be well established and controlling at the time it affirmed Ayala's conviction on direct appeal, as well as at the time the trial court conducted its proceedings. Certainly the state court could not be "frustrated” to find that a federal court determined that it was error to exclude the defense from the Batson proceedings when the state court itself had held that this very same rule was "almost universally recognized” and reached the same determination itself.

. The dissent attempts to reframe the Teague analysis as follows: Thompson merely articulated the rule that defense counsel could not be excluded without “compelling” justification; it was not until after Ayala's conviction became final that courts recognized that the prosecutor's explanation in this case (i.e., not revealing his strategy to the defense) was "not a valid reason not to follow the norm of an adversarial proceeding.” Dissent at 977.
To the contrary, Thompson directly addressed the government's argument that “an adversary hearing is inappropriate because the government lawyer is required to reveal confidential matters of tactics and strategy.” Thompson, 827 F.2d at 1259. In that case, we rejected this claim as a general proposition and held that the determination of whether revealing case strategy could be a compelling justification in a particular case must be determined by examining whether the facts in that case warranted an exception to the general rule. Id. Rules applied on a case-by-case basis do not raise Teague issues. See Wright v. West, 505 U.S. 277, 308, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring) (“If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule.”).

. The dissent ignores the holding of Boyd and instead plucks the words “voir dire transcript” out of the opinion to argue that only a voir dire transcript is necessary for comparative juror analysis. Dissent at 982. If our dissenting colleague believes that jury questionnaires are not tools for comparative juror analysis, we point her to Miller-El v. Dretke (Miller-El II), 545 U.S. 231, 256-57, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) and Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. *959 2006) (en banc), both of which utilized juror questionnaires in comparative juror analysis.

. Ayala also asserts that there is an Eighth Amendment right to appeal — and to a record adequate for appeal — in a capital case. See Whitmore v. Arkansas, 495 U.S. 149, 168, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (Marshall, J., dissenting). We need not decide this question here.

. As the state observes, although Mickens postdates the California Supreme Court's decisión, the opinion simply restates the rule set forth 18 years prior in Cronic.

. If this appeal had come before us prior to the Supreme Court’s decision in Fry, we would have instead asked whether the state court’s determination that any error was harmless under Chapman was contrary to, or an unreasonable application, of federal law. See Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir.2005). Fry clarified, however, that Brecht is the harmless error standard to be applied in such circumstances because the Brecht standard "subsumes” the "more liberal” § 2254(d)/Chapman standard. See Fry, 551 U.S. at 120, 127 S.Ct. 2321; Merolillo, 663 F.3d at 454. In other words, if a federal habeas court determines that the Brecht standard has been met, it also necessarily determines to be an unreasonable application of Chapman a state court’s conclusion that the error was harmless beyond a reasonable doubt. In holding that Ayala has demonstrated his entitlement to relief under Brecht, we therefore also hold to be an unreasonable application of Chapman the California Supreme Court’s conclusion that Ayala was not prejudiced by the exclusion of the defense during Batson steps two and three or by the loss of the questionnaires. See Merolillo, 663 F.3d at 458-59.

. The dissent contends that Brecht no longer provides the proper standard of review for assessing prejudice, arguing instead that "a writ may issue only if we determine that no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his Batson claim.” Dissent at 981. The dissent’s only authority for its conclusion is Harrington v. Richter, - U.S. -, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011), which the dissent claims "refined” the Brecht test. Dissent at 981.
At the same time that the dissent accuses us of "extending each supporting argument just slightly beyond its limitations,” Dissent at 974, the dissent does far worse in applying Harrington to prejudice analysis under AED-PA. In Fry v. Pliler, 551 U.S. 112, 121-22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007), the Supreme Court held that Brecht is the proper test for prejudice analysis under AEDPA. In Harrington, handed down just four years later, the Supreme Court did not once mention Fry or Brecht. Furthermore, the Court’s reference to "fairminded jurist” was not in the context of reviewing a state court's prejudice determination but rather in the context of whether a state court's determination regarding constitutional error was unreasonable. 131 S.Ct. at 785. (Here, of course, error is conceded and only prejudice is at issue.) The dissent thus seems willing to conclude that the Supreme Court radically "refined” Brecht, a nearly two-decade old precedent — a case with central import in virtually all federal habeas adjudication, reaffirmed just five years ago in Fry — without even a mention of that oft-cited case. As if recognizing the futility of its argument, the dissent characterizes its authority as “the essence of the Supreme Court's holdings.” Dissent at 981. We do not know what this "essence” is, but there is no legal basis for the dissent’s conclusion that a case cited almost 10,000 times to determine prejudice in habeas cases was sub silentio drastically overhauled in a discussion unrelated to prejudice.
Additionally, in the eighteen months since Hanington was handed down, we have repeatedly applied the “unrefined” Brecht test to assess prejudice in habeas cases. E.g., Merolillo v. Yates, 663 F.3d 444, 454 (9th Cir.2011); Ybarra v. McDaniel, 656 F.3d 984, 995 (9th Cir.2011); United States v. Rodrigues, 678 F.3d 693, 695 (9th Cir.2012). In some cases, we have cited Hanington in analyzing constitutional error but then, properly, applied the traditional Brecht test when determining prejudice. E.g., Ocampo v. Vail, 649 F.3d 1098, 1106 (9th Cir.2011); Schneider v. McDaniel, 674 F.3d 1144, 1149-50 (9th Cir.2012). Thus, even if we believed that the dissent were correct that Hanington rewrote the test for prejudice (a conclusion that is wholly without support and that we unequivocally reject), this three-judge panel, like all others, is nevertheless required to apply Brecht as it was (and is), because such is the law of the circuit. Lacking support in both Supreme Court and Ninth Circuit case law, the dissent’s pronouncement simply amounts to a preference that the prejudice standard under AEDPA should be far more onerous than current law provides.

. There are also three other questionnaires out of more than 200 which were somehow located, but have no particular significance with respect to a comparative juror analysis.

. The state and the dissent both appear to presume that the only relevant comparisons in a comparative juror analysis are between the struck jurors and the jurors who are ultimately seated, but Miller-El made clear that the otherwise-similar jurors to whom the struck jurors can be compared include those "permitted to serve” by the prosecution but ultimately struck by the defense. See, e.g., Miller-El v. Dretke, 545 U.S. at 244-45, 125 S.Ct. 2317 (comparing a struck juror to a juror not challenged by the prosecution who was later challenged by the defense). This, of course, makes perfect sense: some of these jurors were not struck by the defense until after the prosecution had passed them for several rounds, and the "underlying question is not what the defense thought about these jurors,” but what the prosecution did. Id. at 245 n. 4, 125 S.Ct. 2317.

.Although the record provides somewhat less reason to conclude that the prosecution’s justifications for the strikes of the four other black and Hispanic jurors were pretextual, race may also have played a substantial role in these challenges. For example, Ayala might have been able to show that the prosecution violated Batson when it struck Hispanic juror George S. in the final round of peremptory challenges. The prosecution gave five reasons for striking George S. The first reason — that his application to be a police officer some twenty years prior had been rejected — applied equally to seated white juror Charles C. The second reason — that he had indicated some discomfort with the death *965 penalty — did not significantly distinguish him from a number of seated white jurors. See infra Section V.B.2. The third reason — that he had been a "holdout" on a prior jury — could have been called into question had defense counsel been able to point out that the jury on which George S. had been a "holdout” was a civil one, that the issue in dispute had been the assessment of damages, and that unanimity was not required. The fourth reason — that he had written in his questionnaire that the parties probably would not want him to serve as a juror — overlapped entirely with the third reason, as George S. had explained that he wrote that the parties might not want him as a juror because he had been a civil jury "holdout.” The fifth and final reason — that he placed excessive emphasis on the Bible in his questionnaire — cannot be evaluated at all because the questionnaire has been lost, along with those of others whom the prosecutor might have passed.

. Other seated white jurors to whom defense counsel could have pointed in order to show to be pretextual the prosecution's stated concern that Olanders D. would not be willing to impose the death penalty include Dorothy C., Dorothea L., Dorothy H. and Leona B. See infra Section V.B.2.

. For example, Elizabeth S., who was in all likelihood white, was seated as an alternate on a panel accepted by the prosecution— which never used its sixth and final peremptory challenge in the selection of the alternate jurors — but was later struck by the defense. Her questionnaire, which was lost, might have been particularly valuable to Ayala for comparative juror analysis if her written responses were anything like those she delivered during voir dire. Consider the following exchange between the trial court and Elizabeth S.:
Q: Did you have an opportunity to review the summary of legal issues and preliminary questions? This was a packet of material in the juror's lounge.
A: No.
Q: You didn't read it?
A. Not today. I read the papers that they gave me in the office.
Q. Today?
A. Yeah.
Q. Okay. -That was the summary of legal issues and preliminary- questions?
A. Yeah, Yeah.
Perhaps because of this and similar exchanges, she was later asked if she had a hearing problem, which she did not.

. There is one additional error our dissenting colleague makes that is not limited to the Batson context but would rewrite the law of prejudice in all habeas cases. For that reason, it deserves mention here. As we have explained supra, the well-established Brecht standard governing prejudice has not been revised or modified, and the dissent’s suggestion to the contrary is without merit. See discussion supra at Pages 961-63 & n. 15.